LEACH, Plaintiff in error, v. STATE, Defendant in error.

*No. 76–103–CR.   Argued March 8, 1978.—Decided May 2, 1978.*
(Also reported in 265 N. W. 2d 495.)

202

For the plaintiff in error the cause was argued by *Barbara B. Berman,* assistant state public defender, with whom on the briefs was *Howard B. Eisenberg,* state public defender.

For the defendant in error the cause was argued by *Maryann S. Calef,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

HANLEY, J.  Three issues are presented on this appeal:

1.  Were the defendant's statements properly admitted into evidence?

2.  Was the evidence sufficient to sustain the verdict?

3.  Did the trial court err in refusing to instruct the jury on battery?

*Defendant's Statements*

The defendant contends that the statements here under review were made after his repeated assertions of the right to remain silent and his request for an attorney, and thus in violation of the dictates of *Miranda v. Arizona,* 384 U.S. 436, 865 S. Ct. 1602, 16 L. Ed.2d 694 (1966).

On April 9, 1975, a *Miranda-Goodchild* hearing was held before Judge Leander J. Foley, Jr., to determine the

admissibility of four separate statements made by the defendant on October 14 and 15, 1974, the night of and the day following the defendant's arrest. Three members of the Milwaukee Police Department testified at this hearing. The first witness was Officer William Tengel. He testified that at 10:50 p.m. on October 14, 1974, he and two other police officers went to the defendant's home to investigate the incident which had occurred at the laundromat. The reason that their investigation was directed towards the defendant at that time was that the license plate number given to the police was registered to the defendant's wife. The defendant fit the description of the woman's attacker and he was immediately arrested. After being advised of his constitutional rights and indicating that he understood them, the defendant stated that he returned home from work that evening at 8:30 p.m. The defendant told Tengel that he would say nothing further and questioning ceased. Defense counsel conceded that this statement was constitutionally admissible, and the court so found.

The second witness at the hearing, Officer Duane Luick, testified with respect to the defendant's second statement. At about 1:25 a.m. on the morning following the defendant's arrest, Luick advised the defendant of his constitutional rights and asked him if he understood those rights. The defendant stated he did. Luick then informed the defendant that he was suspected of being involved in an attempted rape and that Luick wanted to get preliminary information from him, *i.e.*, the defendant's place of birth, educational background and membership in the military service. Luick then asked the defendant if he wanted to make any statement regarding the attempted rape. The defendant stated he did not. Luick terminated his questioning and left the interviewing room.

Luick returned to the room about 15 minutes later. At this time defendant, unprompted by any questioning,

made a second statement to the effect that he had been drinking too much and that when he drinks he cannot control himself. Luick asked the defendant if he had anything further to say, and the defendant replied that he wanted to confer with an attorney before making any further statements. Questioning then ceased, and Luick left the room.

The court concluded that the *Miranda* warnings given to the defendant at 1:25 a.m. were effective at 1:50 a.m. when the defendant made this second statement, and that the statement was voluntary.

Detective Robert Puls testified as to the defendant's third statement. Shortly after he made the statement to Officer Luick, the defendant was being escorted to another area of the Safety Building and ultimately to the city jail when he was intercepted by Detective Puls. Puls had been assigned to interview the defendant regarding his possible involvement in several unsolved south side murders. Puls took the defendant to another interviewing room and advised the defendant of his assignment. Puls also advised the defendant of his constitutional rights. Puls then stated that he would not ask the defendant questions relating to the attempted rape charge but would limit his questions to the unsolved murders. The defendant responded that he was not involved in any murders but that he would talk to the detective.

From about 2:00 a.m., when this interview was commenced, to about 2:30 a.m., the conversation was limited to the defendant's general history, particularly the models and makes of automobiles the defendant had owned. (Puls testified that various automobiles had been seen in the vicinity of the various murders, and that his purpose was to determine if the defendant's automobile matched their descriptions.) Puls testified that about 2:30 a.m., the defendant, who had theretofore been alert and coherent, began to get emotional and to cry. The

defendant then informed Puls that he wanted to make a statement regarding the attempted rape. Puls reminded the defendant that he had previously stated he wanted an attorney present before being subjected to further inquiry on this matter, but the defendant responded that he no longer wanted an attorney and that he just wanted to "get it all off his chest." Puls left the room and shortly thereafter returned with another detective. After again being advised of his rights, Puls testified that the defendant made the following statement:

"He stated that he went with two co-workers to Nick's Coal Bin Tavern which is located on 17th and Canal Streets which was in the City of Milwaukee. He stated he played dice and was drinking beer until sometime after 8:30 p.m. on the 14th. He stated that he then left the tavern. He stated he had too much to drink; and at this time, he was planning on going home; and he stated he went to his automobile and drove across the viaduct and as he was going down 13th Street on his way home, he happened to glance over into a laundromat which is on 13th Street. He stated it was around Layton Avenue; he didn't know exactly what the address was. He stated that he saw a woman alone in the laundromat. He stated at this time he received one of his urges similar to which he's had since he's been a teenager and that at this time he pulled his automobile into the parking lot at the rear of the laundromat, entered the laundromat. The woman was still alone. He stated he went to a soda machine, took an orange soda, and then walked near the woman. He stated she was sitting by a wall near the rear of the laundromat; and after taking a couple of sips of the orange drink, he again got a sexual urge to have the woman. It was at this time that he went up to the woman and began scuffling with her. He stated that he then began dragging her out of the building and was taking her to his car. He stated prior to getting to the automobile, he noticed people chasing after him; so he let the woman go, got into his automobile, and immediately went home. He stated that the urge he had was that he wanted to rape the woman, but then he corrected this. He stated, no, he didn't want to rape her. He just wanted to have sexual relations with her."

During the hearing, the defendant testified that he was shown pictures of the murder victims and that this procedure made him upset and nervous. The defendant testified that he therefore made the statements "to assure them I had nothing to do with the murders and that I would . . . talk this other thing over to get off that subject. . . ." The defendant, however, admitted that Puls made no threats or promises to induce him into making the statement. Puls also denied showing the defendant any pictures.

Upon this evidence, the court concluded that this third statement was made voluntarily and without coercion and that it was constitutionally antiseptic:

"There is no evidence in this case of a plot, plan or intriguing method of overhearing or trapping of this defendant. He intelligently waived his constitutional rights defined under the *Miranda* decision and discussed these other crimes. During that investigation he made the determination that he wished to talk about the crime charged in this case. After a waiting period and a redefinition of his rights under *Miranda,* the defendant freely, knowingly and intelligently waived those rights. Without any threat, coercion or entrapment, the defendant made the statement. . . ."

Finally, Officer Tengel testified that during a conversation with the defendant, the defendant told Tengel that "he thought he was sick and that he wanted help." This conversation occurred on the morning following the defendant's arrest while the defendant and Tengel were waiting in the District Attorney's room in the Safety Building. Although Tengel characterized the context of the statement as a "regular conversation" lacking both threats and promises, Tengel admitted that he did not then advise the defendant of his rights. The court concluded that this statement, though voluntary, was not in compliance with *Miranda*.

Inasmuch as both the determination of compliance with the procedural safeguards of *Miranda* and the determination of voluntariness are mixed questions of law and fact, the test on review is the same: the trial court's determination will not be reversed by this court unless it is against the great weight and clear preponderance of the evidence. *Roney v. State,* 44 Wis.2d 522, 533, 171 N.W. 2d 400 (1969).

"[T]he standard on review here is whether the findings of the trial court are contrary to the great weight and clear preponderance of the evidence. . . . Any conflicts in the testimony regarding the circumstances surrounding the confession must be resolved in favor of the trial court's finding." *McAdoo v. State,* 65 Wis.2d 596, 605, 223 N.W.2d 521 (1974).

During the oral argument of this case, the public defender made several references to the fact that the defendant on three occasions asked for an attorney. A review of the *Miranda-Goodchild* hearing transcript does not support this assertion.

Officer Tengel, who testified as to the circumstances surrounding the defendant's first statement, stated that after the defendant told him that he got home from work that evening at 8:30 p.m., the defendant said he would say nothing further. Both on direct and cross-examination, Tengel could not remember the defendant requesting an attorney during this first phase of interrogation. Although the defense introduced a police report of the events at the defendant's home which indicated that the defendant stated he would make no further statements until he had talked to an attorney, Tengel testified that he did not prepare that report. In its findings, the trial court concluded the defendant stated only that he wished to say nothing further, not that he wanted an attorney.

At the end of the second phase of interrogation—where the defendant stated that when he drinks too much he

cannot control himself—there is no question that the defendant expressed a desire to confer with an attorney. Thus, when the defendant made the complete statement to Detective Puls at 2:30 a.m., the statement was made after the defendant had expressed his desire to confer with an attorney once, not three times.

Both parties to this appeal cite *Michigan v. Mosley*, 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed.2d 213 (1975) to support their contentions. In *Mosley,* the defendant was arrested in the early afternoon on April 8, 1971, in connection with two robberies which occurred in Detroit, Michigan. The arresting officer conveyed Mosley to headquarters and advised him of his rights. The officer began questioning Mosley about the robberies, but when the defendant said he would refuse to answer further questions, the interrogation ceased. At 6:00 p.m., Mosley was taken to another part of the building for questioning regarding a murder unrelated to the robberies. This round of questioning was conducted by another officer and the defendant was readvised of his rights. Ultimately, Mosley made a statement implicating himself in the homicide. The statement was admitted into evidence at the trial and the defendant was convicted. The Michigan Court of Appeals reversed the conviction on the grounds that the second phase of interrogation was a *per se* violation of the *Miranda* doctrine, but on appeal the United States Supreme Court concluded that further interrogation under these circumstances was not prohibited by *Miranda.*

We think that the most significant aspect of the *Mosley* opinion is that the Court refused to adopt a strict and unbending interpretation of the *Miranda* doctrine. Although *Miranda* states that "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease" and that "any statement taken after the person invokes his privilege cannot be other than the

product of compulsion, subtle or otherwise. . ." (*Miranda v. Arizona*, 384 U.S. 436, 473, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) ), the Court in *Mosley* concluded that not all interrogation under all circumstances is prohibited:

"It is evident that any of these possible literal interpretations would lead to absurd and unintended results. To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned. At the other extreme, a blank prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests. *Clearly, therefore, neither this passage nor any other passage in the Miranda opinion can sensibly be read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent.*" *Michigan v. Mosley, supra* at 102–03. (Emphasis supplied.)

Rather than adopting either of these extreme interpretations of the *Miranda* doctrine, the Court, recognizing that the critical safeguard identified by *Miranda* is the person's right to cut off questioning, adopted a flexible construction which stressed that the admissibility of a statement made under these conditions would be dependent on whether the defendant's right to remain silent was "scrupulously honored." *Michigan v. Mosley, supra* at 103–04. In determining that Mosley's rights were "scrupulously honored," the Court stressed the following facts: (1) before each interrogation session, the defendant was advised of his rights and the defendant acknowledged his understanding of them; (2) the two-hour interval between sessions was "substantial"; (3) the second

session was conducted by a different police officer in a different setting; and (4) the officer conducting the second, and productive, session agreed to and did limit his questions to an unrelated homicide. *Michigan v. Mosley,* 423 U.S. at 104–05.

These factors are equally present in the case at bar. Before each of the three formal interrogation sessions, the defendant was advised of his constitutional rights. Each session was conducted by a different officer. The first two sessions were brief, and were immediately terminated upon the defendant's announcement that he wished to answer no more questions. The second session occurred approximately 2 hours after the first. Although the third session was commenced shortly after the termination of the second, it was commenced only with the approval of the defendant and was initially limited to exploring the defendant's possible involvement with the unrelated murders. Only after the defendant himself stated he wanted to make a statement were matters relating to the attempted rape covered. Finally, Detective Puls, at this juncture in the proceeding, reminded the defendant that he had previously wished to remain silent with respect to the charged crime and to await the services of an attorney, and by again reciting to the defendant his rights, reminded him of his privilege to do both.

In *Mosley* the court concluded that by looking to the factors referred to above, the courts could conclude that the defendant's right to remain silent had been "scrupulously honored" by the authorities and that the right to remain silent, once invoked, could be waived.

The defendant argues that *Mosley* is limited to those situations in which a defendant invokes only the right to remain silent, and that it was expressly not addressed to the question of whether statements obtained after a defendant requests an attorney are a *per se* violation of

*Miranda.* To a degree, the defendant is correct. In an explanatory footnote, the court in *Mosley* stated, "The present case does not involve the procedures to be followed if the person in custody asks to consult with a lawyer, since Mosley made no such request at anytime." *Michigan v. Mosley,* 423 U.S. at 101, n. 7. Nevertheless, the fundamental concept expressed in *Mosley* is that a defendant's exercise of one of the rights enumerated in *Miranda*—whether it be the right to terminate questioning or the right to the assistance of a lawyer—will not prohibit all subsequent questioning under all circumstances. Indeed, it was probably to differ with the *Mosley* majority for failing to broaden its basis of decision that Mr. Justice WHITE, in his concurring opinion, stated: "Unless an individual is incompetent, we have in the past rejected any paternalistic rule protecting a defendant from his intelligent and voluntary decisions about his own criminal case . . . To do so would be to 'imprison a man in his privileges.' " 423 U.S. at 108–09, *quoting Adams v. United States ex rel. McCann,* 317 U.S. 269, 280, 63 S. Ct. 236, 87 L. Ed. 268 (1942).

In this respect, the court's more recent decision in *Brewer v. Williams,* 430 U.S. 387, 97 S. Ct. 1232, 51 L. Ed.2d 424 (1977) is significant. In *Brewer,* the defendant surrendered himself to authorities in Davenport, Iowa, for arrest on charges stemming from the abduction and murder of a young girl in Des Moines. Before he surrendered himself, Williams contacted a lawyer in Des Moines, Henry McKnight. McKnight, in the presence of two Des Moines police officers, advised Williams that these officers would be driving to Davenport to return him to Des Moines, that the officers would not interrogate him or mistreat him, and that in any event he was not to talk to the officers about the abduction-murder. Meanwhile, Williams was arraigned, and while waiting for his escort to Des Moines, he conferred with a Daven-

port attorney named Kelly. When the Des Moines police officers arrived, Kelly, in their presence, again advised Williams not to talk to the police.

The officers, with Williams in custody, then set out on the 160 mile return trip. At no time did Williams affirmatively express a willingness to be interrogated in the absence of an attorney. Rather, on several occasions, Williams informed the officers that "[W]hen I get to Des Moines and see Mr. McKnight, I am going to tell the whole story." 430 U.S. at 392. Nevertheless, one of the officers, knowing that the defendant was a former mental patient and was susceptible to suggestions phrased in terms of religious doctrine, observed to the defendant that the parents of the girl had a right to give their daughter a Christian burial. Ultimately, Williams showed them where the body was before they reached Des Moines. Williams was convicted and his conviction affirmed. A federal district court, however, on a writ of habeas corpus, reversed the conviction on the grounds that the evidence relating to Williams' disclosure was wrongly admitted to trial. The Supreme Court affirmed on the grounds that the officer's suggestive interrogation violated the defendant's expressed wish to consult with an attorney before relating his involvement in the crime to the police. But in doing so, the court stated: "The Court of Appeals did not hold, nor do we, that under the circumstances of this case Williams *could not*, without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments. It only held, as do we, that he did not." 403 U.S. at 405–06. Thus, the result in *Williams* depended upon the facts of that case, particularly the fact that Williams did not disavow his previous expression of the right to an attorney.

Therefore, not only in *Williams* factually distinguishable from the case at bar, but it is also authority for the proposition—inferred from *Mosley*—that a defendant

may relinquish a previous expression to seek the counsel of an attorney.

The factors emphasized in *Michigan v. Mosley* and in this case should not, in and of themselves, be controlling. Nevertheless, under all of the circumstances of this case, we think that the trial court's determination that the dictates of *Miranda* were observed and that the rights of the defendant were respected is not against the great weight and clear preponderance of the evidence.

The record also demonstrates that the trial court's determination that the defendant voluntarily made these statements is not against the great weight and clear preponderance of the evidence. All three officers testified that the defendant was alert and coherent during each round of questioning. All three officers, as well as the defendant himself, testified that no express threats or promises were made to induce his co-operation. The record also reveals that the defendant was 29 years old at the time of the hearing and that he had previously been involved with the police numerous times. Indeed, the record in its entirety indicates that it was the defendant who initiated the inquiries which led to this statement. Therefore, we cannot say that the trial court, in balancing the personal characteristics of the defendant with the pressures to which he was subjected, decided against the great weight of the evidence when it concluded that the defendant's statements were voluntary. *See, McAdoo v. State, supra* at 606; *Brown v. State,* 64 Wis.2d 581, 587–88, 219 N.W.2d 373 (1974).

*Sufficiency of the Evidence*

The defendant contends that the evidence is insufficient to support the jury's verdict that he was guilty of attempted rape under secs. 944.01 and 939.32, Stats.

Two elements must be fulfilled for a conviction of attempted rape under secs. 944.01 and 939.32, Stats.

"(1) The male must have the intent to act so as to have intercourse with the female by overcoming or preventing her utmost resistance by physical violence, or overcoming her will to resist by the use of threats of imminent physical violence likely to cause great bodily harm; (2) the male must act toward the commission of the rape by overt acts which demonstrate unequivocally, under all the circumstances, that he formed the intent to rape and would have committed the rape except for the intervention of another person or some other extraneous factor." *Oakley v. State*, 22 Wis.2d 298, 306, 125 N.W.2d 657 (1964).

The requisite intent in an attempted rape case may be inferred because "the sole evidence of intent in attempted rape cases is almost always confined to the overt acts of the accused." *Adams v. State*, 57 Wis.2d 515, 519, 204 N.W.2d 657 (1973).

The evidence adduced at trial which supports the defendant's conviction may be summarized as follows: The defendant approached the victim in the laundromat, grabbed her, repeatedly struck her, and dragged her into the men's room. Once in the men's room, he shut the door and ordered the victim to remove her pants. When she refused to remove her clothing, he again struck her, knocking her to the ground. The defendant then unsnapped and unzipped the victim's pants. When the victim regained her feet, the defendant pulled her underpants away from her body. During this time, the victim continued to scream and to struggle with the defendant. He then grabbed her arm and said, "We're going for a ride." He led her out of the laundromat and, presumably to overcome her resistance, informed her he had a knife.

When they reached the car, the victim seized the car keys. As the defendant and victim continued to struggle, two bystanders approached. The victim released the keys, and the defendant fled the scene.

The defendant attempted to lessen the obvious inference of intent drawn from this evidence by testifying that his desire for the victim evaporated in the men's room, and that his subsequent actions were intended merely to take the victim to a place where she would be unable to contact the police.

However, this court has stated:

" 'On appeal this court is not concerned with the evidence which might support other theories of the crime, it is concerned only with ascertaining whether the trier of fact could, acting reasonably, exclude these other theories and make findings supporting the guilt of a defendant.' " *Adams v. State, supra* at 520; *State v. Lindsey,* 53 Wis.2d 759, 768, 193 N.W.2d 699 (1972).

Here, there is sufficient evidence upon which the jury could reasonably conclude that the defendant's intent throughout the incident was to rape the victim, and that his efforts to remove the victim from the area of the laundromat was for the purpose of finding a more secluded and convenient place to accomplish his goal. We think the evidence in this case was sufficient to entitle the jury to find, beyond a reasonable doubt, that defendant's overt acts were with the intent to rape the victim.

*Lesser Included Offense*

Defendant contends that the trial court should have submitted to the jury a verdict based on the crime of battery, under sec. 940.20, Stats., as a lesser included crime to the charge of attempted rape.

There are two requirements for the submission of a lesser included offense: (1) reasonable grounds for ac-

quittal on instructed offenses greater than that requested; and (2) reasonable grounds for conviction on the lesser offense requested. *Garcia v. State,* 73 Wis.2d 174, 186, 242 N.W.2d 919 (1976). Although the evidence should be viewed in the light most favorable to the defendant in determining whether these requirements are met (*Ross v. State,* 61 Wis.2d 160, 172, 211 N.W.2d 827 (1973)), this court has stated that "juries are not to be given the discretion or freedom to pick and choose what offense the accused should be found guilty of." *State v. Melvin,* 49 Wis.2d 246, 253, 181 N.W.2d 490 (1970).

Here, no reasonable view of the evidence of this case leaves any of the elements of the charged crime doubtful. The defendant gave the police a statement in which he stated his purpose during the altercation was to rape the victim. He later changed his wording to indicate he wanted to have sexual intercourse with the victim. He then stated that during the altercation in the men's room, he changed his mind and wanted only to get the victim to a place where she could not contact the police.

Under the facts of this case, the only reasonable interpretation of this evidence is that the victim, by her screams and struggles, rendered the small men's room too conspicuous for the defendant to accomplish his admitted purpose; that he would have carried out his intent but for the intervention of an extrinsic force not in the control of the defendant. Clearly, the trial court did not err in refusing the requested instruction on battery.

*By the Court.*—Judgment and order affirmed.

ABRAHAMSON, J. (*dissenting*). Even if I were to agree that the test announced in *Michigan v. Mosley,* 423 U.S. 96, 104 (1975), is sufficient under the Wisconsin Constitution to enforce the privilege against self-incrimination, I could not agree that the record in this case supports the conclusion that Leach's right to cut

off questioning was "scrupulously honored." Indeed, the limited holding in *Mosley* would seem to compel a determination that Leach's statement was the product of the "inherently compelling pressures" of custodial interrogation. *See Miranda v. Arizona,* 384 U.S. 436, 467 (1966).

The United States Supreme Court determined on the basis of the following factors that Mosley's right to cut off questioning had been "fully respected": (1) before his initial interrogation, Mosley was carefully advised of his rights under *Miranda v. Arizona;* (2) when Mosley stated that he did not want to discuss the robberies for which he had been arrested, Detective Cowie immediately ceased the interrogation and *did not try either to resume the questioning or in any way to persuade Mosley to reconsider his position;* (3) after an interval of more than two hours, Mosley was given full *Miranda* warnings by another police officer, who questioned him at another location about a murder in which Mosley had been implicated but which was unrelated to the robberies for which he had been arrested; and (4) the questioning by the officer who conducted the second interrogation *focused exclusively on the unrelated murder and was thus quite consistent with reasonable interpretation of Mosley's earlier refusal to answer any questions about the robberies.* 423 U.S. at 104–105. These facts led the *Mosley* court to conclude that "This is not a case . . . where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." 423 U.S. at 105–06.

The case at bar is not one in which the accused's exercise of his constitutional right to remain silent was "scrupulously honored." To the contrary, the

record shows that Leach's interrogators refused to take "No" for an answer.

Leach was first questioned at this home at approximately 10:50 p.m. after being given full *Miranda* warnings. After stating that he had returned home from work that evening at 8:30 p.m., Leach told the arresting officers that he would answer no further questions about the attempted rape. Although no further questions were asked at this point, it appears that Leach was probably in the presence of law enforcement personnel for the following two and one-half hours.

At 1:25 a.m. Leach was taken by Officer Duane Luick to the vice squad interview room. Although he had stated at the time of his arrest that he wished to answer no further questions about the attempted rape, Leach was again given *Miranda* warnings and asked if he wished to make a statement. Leach again invoked his right to remain silent, and Officer Luick left the room. Leach sat alone in the interview room until Officer Luick reappeared, some fifteen minutes later. It was at this point that Leach, unprompted by any *overt* questioning, stated that he had been drinking too much and that when he drinks he cannot control himself. Officer Luick asked Leach if he had anything further to say, and Leach said that he did not and that he wanted to confer with an attorney.

At about 2:00 a.m.—approximately twenty minutes after Leach said he did not want to talk without an attorney—while Leach was being escorted to the City Jail, he was intercepted by Detective Robert Puls and taken to an interview room. Detective Puls, explaining that he was investigating "unsolved murders," gave Leach his third set of *Miranda* warnings and told Leach that he would not ask him about the attempted rape charge but would limit his questions to the unsolved murders. Leach agreed to talk about the murders.

The record does not support a conclusion that Leach was in fact suspected of involvement in the unsolved murders, and indeed Leach was never charged with murder. However, in questioning Leach about the murders, Detective Puls did elicit information of significance to the attempted rape charge. Detective Puls asked Leach about the automobiles he drove and about his prior arrests. It was the car Leach had been driving which led to his arrest in the attempted rape charge; and Leach's arrest record included several charges of rape and attempted rape. To quote Detective Puls: "It was during this period that he [Leach] became very emotional . . . tears came to his eyes; and it appeared he wanted to cry . . . he stated because he has a problem, he gets sexual urges to molest women . . . ."

The United States Supreme Court stated in *Mosley* that "[t]he requirement that law enforcement authorities must respect a person's exercise of [his option to terminate questioning] counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " 423 U.S. at 104. Leach's right to cut off questioning was not respected.

The majority likens the facts of this case to the factual situation in *Mosley.* Yet in *Mosley,* law enforcement officials "did not try either to resume the questioning or in any way to persuade Mosley to reconsider his position" once Mosley had invoked his right to remain silent. 423 U.S. at 104. In the case at bar, law enforcement officials resumed their questioning about the attempted rape two and one-half hours after Leach had first invoked his right to silence. Moreover, it is difficult to escape the conclusion that when Officer Luick left the interview room, only to reappear some fifteen

minutes after Leach had for the second time refused to make a statement, Luick's intent was to "persuade [Leach] to reconsider his position."

In *Mosley*, the second interrogation did not undercut Mosley's previous decision not to answer inquiries about the robberies for which he had been arrested. It focused exclusively on the unrelated murder, and was thus "quite consistent with a reasonable interpretation of Mosley's earlier refusal to answer any questions about the robberies." 423 U.S. at 105. In the case at bar, Detective Puls' questions—whether or not by design—elicited information relevant to the charge about which Leach had at this point three times asserted his right to remain silent.

To hold that Leach's right to cut off questioning was "scrupulously honored" simply because he was advised of his rights by three different officers whose questioning about ostensibly different crimes persisted far into the night is to stray far from the limited holding in *Mosley*. Because the state failed to show that Leach's statements were not the result of "repeated efforts to wear down his resistance and make him change his mind," 423 U.S. at 105–06, the statements made after Leach invoked his right to silence should not have been admitted.

Because Leach, unlike Mosley, asserted his right to counsel, I have reservations whether this case is governed by *Mosley*.[1]

As the majority opinion notes, the United States Supreme Court specifically said that the *Mosley* case did

---

[1] *See People v. Washington*, 68 Ill.2d 186, 369 N.E.2d 57, cert. den. 56 L. Ed.2d 72 (1978), where questioning continued after the defendant requested an attorney and the court relying on *Mosley* said that "the instant case involves the right to counsel, as distinguished from the right to remain silent."

*See also Micale v. State*, 76 Wis.2d 370, 373, 251 N.W.2d 458 (1977).

not speak to the procedures to be followed when the accused asks to consult with a lawyer. Mosley had made no such request. The Supreme Court went on to explain in footnote 7, only partially quoted by the majority, that "those procedures [to be used when the accused asks to consult with counsel] are detailed in the *Miranda* opinion as follows:

" 'If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

" 'This does not mean, as some have suggested, that each police station must have a "station house lawyer" present at all times to advise prisoners. It does mean, however, that if police propose to interrogate a person they must make known to him that he is entitled to a lawyer and that if he cannot afford one, a lawyer will be provided for him prior to any interrogation. If authorities conclude that they will not provide counsel during a reasonable period of time in which investigation in the field is carried out, they may refrain from doing so without violating the person's Fifth Amendment privilege so long as they do not question him during that time.' " *Miranda v. Arizona,* 384 U.S. at 474, quoted in *Michigan v. Mosley,* 423 U.S. at 101, n. 7.[2]

[2] *See also* footnote 10 of the majority opinion *Michigan v. Mosley,* 423 U.S. at 104, n. 10, which states:

"10. The dissenting opinion asserts that *Miranda* established a requirement that once a person has indicated a desire to remain silent, questioning may be resumed only when counsel is present. *Post,* at 116–117, 96 S. Ct. at 332, 333. But clearly the Court in *Miranda* imposed no such requirement, for it distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney and directed that 'the interrogation must cease until an attorney is present' only '[i]f the individual states that he wants an attorney.' [384 U.S. 436, 474, 86 S. Ct. 1602, 1620, 16 L. Ed.2d 694, 723.]"

Even if *Brewer v. Williams*, 430 U.S. 387 (1977), cited by the majority, is authority for the proposition that an accused may waive his previously asserted demand for counsel, *Mosley* itself lends no support to the majority's apparent conclusion that *Mosley's* test for the admissibility of statements obtained after invocation of the right to silence is sufficient as well to test the admissibility of statements obtained after invocation of the right to counsel.

It was incumbent upon the State to prove that Leach knowingly and intentionally relinquished his right to counsel, and it was incumbent upon the court to indulge in every reasonable presumption against waiver. *Brewer v. Williams*, 430 U.S. 387, 404 (1977). Under the circumstances of this case, this court should not hold that Leach waived his right to counsel.

For these reasons, I respectfully dissent.

---

Justice White, in a concurring opinion in *Mosley* (423 U.S. at 110, n. 2), noted:

"2. The question of the proper procedure following expression by an individual of his desire to consult counsel is not presented in this case. It is sufficient to note that the reasons to keep the lines of communication between the authorities and the accused open when the accused has chosen to make his own decisions are not present when he indicates instead that he wishes legal advice with respect thereto. The authorities may then communicate with him through an attorney. More to the point, the accused having expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism."