James WENTELA, Plaintiff in error,

v.

STATE of Wisconsin, Defendant in error.

Supreme Court

*No. 77–376–CR. Argued December 5, 1979.—Decided April 1, 1980.*
(Also reported in 290 N.W.2d 313.)

For the plaintiff in error there were briefs and oral argument by *Howard B. Eisenberg,* state public defender.

For the defendant in error the cause was argued by *David J. Becker,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

WILLIAM G. CALLOW, J. Plaintiff in error James Wentela (defendant) was convicted, following a jury trial, of second-degree murder contrary to sec. 940.02, Stats. 1975. On review he contends that an alleged confession made by him to a polygraph examiner was impermissibly obtained and, consequently, was erroneously admitted into evidence. We agree and reverse the judgment of conviction. /

In the early morning of June 7, 1976, defendant and five companions were drinking and driving around in defendant's bus. About 4 a.m. defendant began dropping his companions off in the following order: Sue Lehto, Debbie Irons, Gary Wade, and Kevin Laakso. When Laakso left the bus, Charmaine Louis (Louis), the victim, was still on the bus with the defendant.

When Louis did not return home by morning, her mother contacted the sheriff's office. Detective Gene Starkey talked to the defendant on June 11, 1976, and the defendant confirmed that he, the victim, and others had been drinking beer and driving around in his bus. The defendant said he dropped Louis off one-half mile west of Iron River near the bridge because he could see the Iron River squad car sitting between two buildings in town. Detective Starkey testified he doubted the defendant could see the squad car from the position he described; and after checking the area and talking

with Louis's mother, he concluded he was looking for a body and not a runaway.

On August 23, 1976, a Brule resident found a shallow grave and human bones scattered in a gravel pit. A jawbone found 16 feet from the grave was identified as that of Louis by the use of dental charts and X-rays.

While the record is silent concerning the circumstances of defendant's arrest, the parties have stipulated that at 6:30 p.m., on August 23, 1976, the defendant was arrested at his home pursuant to a request from the Bureau of Probation and Parole.

On August 24, 1976, at about 6 p.m., Douglas County Undersheriff Richard Lindberg (Lindberg) brought the defendant to an interrogation room in the Douglas county jail. At trial Lindberg testified that at that time he informed the defendant of his rights, under *Miranda v. Arizona,* 384 U.S. 436. (1966), and the defendant then signed a waiver of these rights along with an acknowledgment that they were understood by him. Below the list of defendant's rights but immediately above his signature appears the following paragraph:

"I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."

Lindberg also discussed with the defendant the possibility that the defendant take a polygraph examination, and the defendant agreed to talk to the polygraph examiner. Following this discussion with Lindberg, the defendant was interviewed by Terry Lundgren (Lundgren), the polygraph examiner.

Lundgren began the interview shortly after 6 p.m. on August 24, 1976, and it continued, except for a ten- to twenty-minute break, until shortly after midnight.

Lundgren and the defendant were alone in the interrogation room in which there was a one-way glass which Lundgren stated he had told the defendant about at the beginning of the interview. Lundgren started by explaining the forms which the defendant was to sign prior to the polygraph examination. They included a personal data form, an authorization for the polygraph examination, and a stipulation agreement concerning the admissibility of the examination results in court. The authorization form contained an acknowledgment that the defendant had been advised of his constitutional rights, as well as a statement that the defendant's consent to the examination was given of his "own free will," and authorized release of the examination results to Sheriff Johnson. The defendant provided the personal data and executed the authorization form. At the time the defendant signed the authorization, Lundgren told the defendant he would tell only Sheriff Johnson about their interview. During cross-examination at the suppression hearing, Lundgren conceded he may also have told the defendant he would not tell anyone. Lundgren then gave the defendant a stipulation agreement concerning the admissibility of the examination in court. When Lundgren read a part of the stipulation concerning the death of Louis, the defendant said he did not want to take the examination.

Lundgren testified at the preliminary examination and again at the suppression hearing that at this point the defendant said, " 'I think I need an attorney,' " or " 'I think I should see an attorney.' " Although Lundgren testified he did not consider this a formal request for counsel, he told the defendant he would see what he could do and got up and left the interrogation room. Lundgren testified that his effort to get an attorney consisted of his telling a "Pat" to tell the sheriff of the request because he did not know whom to call. Lundgren

testified that, during the time he was out of the interrogation room, he and Sheriff Johnson agreed that Lundgren would return to the interview room and appear to be upset with Lindberg for talking with the defendant. This testimony suggests that Lundgren did not avail himself of the opportunity to tell the Sheriff firsthand of the defendant's request to consult with an attorney. He testified he believed he told the defendant he had passed on the defendant's request for counsel when he returned to the interrogation room.

While Lundgren was gone and the defendant was alone, Lindberg entered for security reasons. He and the defendant conversed, and he tried to get the defendant to agree to cooperate with the examiner concerning the polygraph examination. At the preliminary, Lindberg testified he was not in the room to interrogate the defendant. However, at the suppression hearing, Lindberg testified he asked the defendant if the defendant did something to Louis; the defendant responded, " 'I don't know,' " then added " 'I would have to talk to an attorney first.' " At trial, Lindberg responded, "Absolutely not," when asked if the defendant had requested an attorney during the break in the interview. When confronted with his testimony at the suppression hearing, Lindberg agreed the defendant had said something about an attorney, but declared that it was not a formal request.

When Lundgren returned to the interrogation room, he asked Lindberg to leave the room. Lundgren then began to go over the stipulation agreement again. The defendant still refused to take the polygraph examination. Lundgren then tore up the stipulation form and told defendant to tear up his copy. At this time Lundgren told the defendant that the defendant's refusal to take the examination meant that he had something to hide in this case and asked him, "if he in fact did cause

Charmaine Louis' death." The defendant gave a gestured response that they had previously agreed would indicate an affirmative answer.[1]

Immediately following the gestured affirmative response, Lundgren gave the defendant the *Miranda* rights form and had the defendant read the form. Lundgren explained the rights and warnings. The defendant placed his initials after each sentence and signed and dated the form.[2] Following the execution of the *Miranda* document, the defendant was questioned about the details of the death of Louis and gave gestured responses relating to the circumstances of her death. Lundgren testified that the defendant told him that he and Louis were in the bus, and when the defendant's sexual advances to Louis were rebuked, he became angered and hit her with a tire iron. He said Louis was nude and that he drove to the gravel pit, throwing her jewelry out on the way, and dragged the body to the grave site in the gravel pit. During the interrogation the defendant did not ask for an attorney. At the completion of the interrogation, the defendant asked for attorney Joseph A. McDonald, and McDonald was summoned.

A criminal complaint alleging the defendant had caused the death of Louis, contrary to sec. 940.02, Stats. 1975, was filed on August 27, 1976. A motion to dismiss was denied orally during the preliminary hearing. Following the filing of an information, a motion to suppress was filed. The motion asked the court to suppress all verbal statements made by the defendant to the polygraph examiner, Lundgren, and any other officers be-

[1] Because the defendant was concerned about the conversation being overheard, he and Lundgren had agreed that hand signals would substitute for vocal responses.

[2] The form containing the acknowledgment and waiver of *Miranda* rights is identical to the form the defendant signed for Undersheriff Lindberg, which is quoted above.

cause they were coerced and were given prior to the defendant's receiving *Miranda* warnings.

Following the suppression hearing on February 11, 1977, the court filed its findings of fact and conclusions of law on the defense motions. The conclusions of law stated (1) the confession was not inadmissible because the defendant was told his rights and waived them after making the statement that he thought he needed an attorney; (2) the interrogation methods were not such that would induce a false confession; (3) the promise made by the examiner, not to tell anyone but the sheriff, was not likely to cause a false confession; (4) the circumstances required *Miranda* rights, each and all warnings were given, and defendant understood them; (5) the defendant's statement was voluntary; and (6) the statement is admissible in evidence beyond a reasonable doubt and as a matter of law.

At trial, before the jury was brought in, the state informed the court that there was a change of facts regarding the circumstances of the defendant's confession. The court then took Lindberg's testimony out of the hearing of the jury. Lindberg's testimony was offered at this time to correct testimony he had given at the suppression of evidence hearing. At that hearing, he testified that the only time he talked to the defendant was between 6 p.m. and 6:30 p.m. on August 24, 1976, after Lundgren interviewed the defendant the first time and while he was attending the defendant for security purposes and that he had given the defendant the *Miranda* rights. Lindberg testified that he was now aware of errors in his suppression hearing testimony after reading the transcript of the preliminary hearing. Lindberg testified that he had seen the defendant twice on August 24. The first time he saw him, at approximately 6 p.m., he gave the defendant his *Miranda* warnings and discussed the possibility of the defendant taking

a polygraph examination. Later, when the polygraph examiner left the defendant for a few minutes, Lindberg went into the room for security purposes because the defendant was alone. He said he did not go in to interrogate. While sitting in the room with the defendant, Lindberg asked the defendant why he did not want to take the polygraph examination. Lindberg said the defendant answered by saying, "you already think I'm guilty." Lindberg responded by saying, "are you?" The defendant answered by saying, "I don't know." The court amended the earlier findings of fact and conclusions of law by summarizing Lindberg's corrected testimony and accepting it as the premise for receiving in evidence statements of the defendant implicating him in the crime. At the conclusion of the trial, the jury returned a verdict of guilty of second-degree murder on March 23, 1977.

The question at issue is whether the statement implicating the defendant in the death of Louis was admissible in evidence.

Relying on *Miranda v. Arizona, supra,* the defendant contends that his conviction must be reversed because the state failed to honor his request for counsel and instead continued interrogation, invalidating his subsequent confession.

The Supreme Court held in *Miranda* that, unless a defendant receives certain warnings and waives the rights included in those warnings, statements stemming from custodial interrogation are inadmissible at trial. 384 U.S. at 444, 478–79. The Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. The court also stated, in dictum, that the police may not question a person who

indicates in any manner and at any stage of the process that he wants to consult with counsel. *Id.* at 444–45. More specifically, the court said:

"If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent." *Id.* at 474.

We have no difficulty concluding that this case presents a situation to which these proscriptions apply. First, polygraph examiner Lundgren's questioning of the defendant constitutes custodial interrogation. Contrary to the state's suggestion, constitutional safeguards cannot be diluted by a practice of engaging private individuals to act on behalf of the police. Second, the defendant's statement, " 'I think I need an attorney,' " or " 'I think I should see an attorney,' " is a sufficient request for counsel. *Micale v. State,* 76 Wis.2d 370, 373, 251 N.W.2d 458 (1977). Thus the issue in this case is whether the conduct of Lindberg and Lundgren which led to the defendant's incriminating statement did in fact violate the right to counsel discussed in *Miranda* so as to render the statement inadmissible in evidence against the defendant at his trial.

The defendant argues that *Miranda* creates a per se proscription of further interrogation once the right to counsel has been invoked. We do not believe *Miranda* requires a blanket prohibition.[3] While the United States

---

[3] Other jurisdictions are divided over whether an in-custody suspect's request for counsel imposes a per se rule prohibiting the resumption of police questioning until an attorney is present. *See: People v. Grant,* 45 N.Y.2d 366, 375 n. 1, 380 N.E.2d 257, 262 n. 1 (1978) (collecting cases); Note, *Fifth Amendment, Confessions, Self-Incrimination—Does a Request for Counsel Prohibit a*

Supreme Court has not yet addressed this contention in a right-to-counsel case,[4] these issues were presented to this court and decided in *Leach v. State,* 83 Wis.2d 199, 265 N.W.2d 495 (1978).

In *Leach v. State, supra,* this court refused to adopt a per se rule prohibiting the police from resuming questioning after the right to counsel is invoked until an attorney is present. Our decision not to adopt "a strict and unbending interpretation of the *Miranda* doctrine," *Id.* at 209, was influenced by the refusal of the United States Supreme Court to do so in a "right to remain silent" case, *Michigan v. Mosley,* 423 U.S. 96 (1975). The defendant in *Mosley,* after having been arrested and given his *Miranda* warnings, stated that he did not want to answer any questions about the robberies with which he was charged. The officer ceased questioning, but some two hours later Mosley was taken to another room for questioning regarding a murder unrelated to the robberies. This round of questioning was conducted by a different officer, and the defendant was, before questioning, readvised of his rights, which he

---

*Subsequent Waiver of MIRANDA prior to the Presence of Counsel?* 23 Wayne L. Rev. 1321 (1977).

[4] *But see: Rhode Island v. Innis,* 440 U.S. 934, 99 S. Ct. 1277 (1979), *granting cert.* to 391 A.2d 1158 (R.I. 1978). *Innis* was argued on October 30, 1979, and has not yet been decided. In *Innis,* the Rhode Island Supreme Court held that an in-custody suspect who had invoked the right to counsel was subsequently "interrogated" for purposes of *Miranda* when subjected to "subtle compulsion" by means of a conversation between police officers, not addressed to the suspect but pertaining to the crime with which he was charged. 391 A.2d at 1161–62. Applying *Miranda* strictly, the court concluded that, unless a valid waiver occurred, the officers' statements constituted a violation of the suspect's Fifth Amendment rights. The court refused to find a waiver of the previously asserted Fifth Amendment rights when the suspect, in response to such conversation, indicated to the officers he would incriminate himself and was then readvised of his *Miranda* rights before the actual incrimination took place. 391 A.2d at 1163–64.

waived. Ultimately, Mosley made a statement implicating himself in the homicide. At trial, Mosley contended that the second interrogation constituted a violation of his right against self-incrimination in that his desire to remain silent was not respected. The state appellate court agreed, reading *Miranda* to create a per se proscription against reinterrogation. The United States Supreme Court reversed.

In *Mosley,* the Court determined that the fruits of questioning a suspect after he expressed a desire to remain silent were admissible in evidence so long as it was shown that the police had "scrupulously honored" the right of the defendant to terminate questioning. 423 U.S. at 103–04. While the court did not enunciate exactly what "scrupulously honored" was to mean, it did find that the officer's conduct in *Mosley* passed muster. In doing so, the court held that interrogation of one who has invoked his right to silence may be resumed at least in the following circumstances: (1) The original interrogation is promptly terminated, *Id.* at 104, 106; (2) The questioning is resumed only "after the passage of a significant period of time," *Id.* at 106; (3) The suspect is given "full and complete *Miranda* warnings at the outset of the second interrogation," *Id.* at 104, 106; (4) A different officer resumes the questioning, *Id.* at 104–05; and (5) The second interrogation is "restricted . . . to a crime that had not been a subject of the earlier interrogation." *Id.* at 106. The presence of these factors in a reinterrogation situation indicates that the potentially coercive effect of the renewed attempt to question a suspect may be held to be so low as to justify a finding that a statement elicited through questioning after the suspect has invoked his privilege is *not* "the product of compulsion," the primary concern of *Miranda.*

In *Leach v. State, supra,* we declined the defendant's invitation to limit *Mosley* to those situations in which a suspect invokes only the right to remain silent and instead indicated that the factors emphasized in *Mosley,* while not controlling, could be considered in determining whether continued interrogation was a violation of the suspect's right to counsel. 83 Wis.2d at 210–11, 214. These factors were found to be present, and the defendant's subsequent statement was admitted. *Id.*

We reaffirm our belief, expressed in *Leach,* that application of *Mosley's* "scrupulously honored" standard to request-for-counsel situations rather than an inflexible per se exclusion removes irrational obstacles to legitimate police conduct while affording suspects an opportunity to make subsequent reassessments of their interests. However, our result differs from that of *Leach,* for a review of the facts surrounding the defendant's interrogation demonstrates that the defendant's right to counsel was not " 'scrupulously honored.' " 83 Wis.2d at 210, quoting *Michigan v. Mosley, supra* at 103–04.

Only the first of the *Mosley* factors is present. When the defendant indicated to Lundgren that he wanted an attorney, Lundgren told the defendant he would see what he could do and then left the interrogation room. As for the second factor, no "significant period of time" elapsed after the defendant's request for counsel before questioning resumed. If Lindberg's questions are viewed as renewed interrogation (as they well could be, for Lindberg testified he asked the defendant if the defendant did something to Louis), questioning was resumed virtually immediately. Lundgren's questioning, which clearly was renewed interrogation, resumed after only a ten- to twenty-minute break. In these circumstances, such an interval is clearly insufficient.[5] As

[5] Courts passing on this question, both subsequent to *Michigan v. Mosley,* 423 U.S. 96 (1975), and prior to that decision but em-

noted by the court in *Mosley, supra* at 102, "[t]o permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned."[6]

The third factor emphasized by the court in *Mosley, supra* at 104, was the readministration of "full and complete *Miranda* warnings at the outset of the second interrogation."[7] In its findings of fact, the trial court found that Lundgren read the defendant his *Miranda* warnings and that the defendant signed and initialed a form acknowledging and waiving his rights prior to

ploying similar approaches, have yielded varying answers as to what constitutes a sufficient interval. For pre-*Mosley* decisions, *see, e.g., United States v. Collins,* 462 F.2d 792, 796–97 (2d Cir. 1972) *cert. denied* 409 U.S. 988 (one- to five-hour intervals sufficient); *United States v. Clark,* 499 F.2d 802, 807 (4th Cir. 1974) (four hours insufficient); *Jennings v. United States,* 391 F.2d 512, 516 (5th Cir. 1968) (one hour sufficient); *United States v. Jackson,* 436 F.2d 39, 41 (9th Cir. 1970) (four days sufficient); *State v. Robinson,* 87 S.D. 375, 377–80, 209 N.W.2d 374 (1973) (fifteen minutes sufficient). In *Mosley, supra* at 104, two hours was held to be sufficient. For post-*Mosley* cases, *see, United States v. Jakakas,* 423 F. Supp. 564, 569 (E.D.N.Y. 1976) (one to three minutes insufficient); *United States v. Miller,* 432 F. Supp. 382, 389–90 (E.D.N.Y. 1977) (two hours insufficient); *United States v. Mearns,* 443 F. Supp. 1244, 1253 (D. Del. 1978) (questioning resumed "within moments" of assertion of right—insufficient); *People v. Grant, supra* note 3, at 376 (ten minutes insufficient).

[6] *Accord: United States v. Hernandez,* 574 F.2d 1362, 1368–69 (5th Cir. 1978); *United States v. Chansriharaj,* 446 F. Supp. 107, 108–09 (S.D.N.Y. 1978); *United States v. Lewis,* 425 F. Supp. 1166, 1175 (D. Conn. 1977).

[7] It has been argued that "a fresh set of warnings is a *minimal requirement* for the resumption of questioning." Kamisar, "*Brewer v. Williams, Massiah,* AND *Miranda:* WHAT IS 'INTERROGATION'? WHEN DOES IT MATTER?" 67 Geo. L.J. 1, 72 (1978).

the question which solicited the defendant's gesture indicating guilt. Our review of the record convinces us that this finding is "against the great weight and clear preponderance of the evidence," *Turner v. State*, 76 Wis. 2d 1, 17, 250 N.W.2d 706 (1977), and must be set aside. At the suppression hearing, Lundgren unequivocally testified, no less than four times, that the defendant's gestured response indicating guilt occurred prior to the renewal of *Miranda* warnings. The record in no way supports the trial court's finding, with the exception of Lundgren's negative answer to the following question: "Prior to the explanation and signing of that document [the second acknowledgment and waiver form] by Mr. Wentela, did you question [the defendant] regarding the facts or circumstances surrounding the alleged death or murder of Charmaine Louis?" However, we conclude from the sequence of testimony that this question was limited to interrogation regarding the "facts and circumstances" surrounding the death (*i.e.*, time, place, method, motive), unrelated to the question of whether the defendant committed the murder.[8]

Finally, it is plain that the fourth and fifth *Mosley* factors are not present. While a different officer (Lindberg) continued the questioning when Lundgren left the interrogation room, the defendant's inculpatory statements were made in response to Lundgren's inquiries, resumed after a ten- to twenty-minute lapse. With regard to the fifth factor, the second interrogation was not "restricted . . . to a crime that had not been a subject of the earlier interrogation"; all of the later questioning concerned the defendant's role in the disappearance of Louis. In *Mosley*, the court appeared to have

---

[8] We note that acceptance of the trial court's finding would not, of itself, compel a conclusion that the defendant's asserted right to counsel was scrupulously honored, in view of the circumstances of the case. Solicited waivers, obtained in the course of

assigned considerable weight to this factor.[9] In *Leach,* while the defendant eventually confessed to the attempted rape about which he was first questioned, the second round of interrogation "was initially limited to exploring the defendant's possible involvement with the unrelated murders." 83 Wis.2d at 211.

In *Mosley,* the court was not concerned with the procedure which the custodial authorities must follow when a suspect asserts the right to counsel.[10] When counsel has been requested, there are factors in addition to those enumerated in *Mosley* which must be considered. In determining whether a suspect's asserted right to counsel has been scrupulously honored, the court should consider the extent to which the authorities have acted to effectuate the suspect's request. Once a suspect asserts the right to counsel, it cannot be found that the authorities have scrupulously honored the request before they renew interrogation unless (1) the suspect was afforded an opportunity to personally obtain the assistance of counsel; or (2) reasonable steps were taken by the authorities to obtain an attorney where the suspect did not

custodial interrogation initiated by the police following an accused's unhonored request for counsel, are "properly . . . viewed with skepticism." *Michigan v. Mosley, supra,* 432 U.S. at 110 n. 2 (White, J., concurring).

[9] The court noted that subsequent questioning "about an unrelated homicide was quite consistent with a reasonable interpretation of Mosley's earlier refusal to answer any questions about the robberies." *Michigan v. Mosley, supra* at 105. *See also:* Stone, *The Miranda Doctrine in the Burger Court,* 1977 Sup. Ct. Rev. 99, 134 ("[T]his fact seems critical, for in its absence one is left only with a renewed effort to question by a different member of the same police force, in a different room in the same building, only two hours after Mosley's assertion of his right not to be questioned").

[10] *See: Michigan v. Mosley, supra* at 101 n. 7; *Id.* at 110 n. 2 (White, J., concurring).

utilize the opportunity to obtain counsel or where that opportunity was not offered.[11] Additionally, if the suspect is not made aware prior to interrogation of the steps which have been taken to accommodate his request for counsel, it is strong evidence that a solicited waiver of the asserted right to counsel was not voluntarily, knowingly, and intelligently given. Such information is of significant assistance to the suspect in any reconsideration of the initial decision to request counsel. We have already noted that Lundgren told the defendant of the steps which were taken to comply with his request.

A review of the circumstances leading to the defendant's confession reveals that his "right to counsel" was not respected in this case. We repeat our caution that the absence or presence of the *Mosley* factors is not exclusively controlling; *Michigan v. Mosley, supra,* and *Leach v. State, supra,* do not purport to establish tests which can be applied woodenly. The critical inquiry remains: Was the defendant's right to counsel scrupulously honored? In the case at bar, we conclude that it has not been respected and that the defendant's statements are not the result of a waiver of that right "voluntarily, knowingly and intelligently" made. *Miranda v. Arizona,* 384 U.S. at 444. Thus we are compelled to hold that the defendant's statements concerning his involvement in the death of Louis were obtained in violation of his *Miranda* rights and should have been suppressed.

Lundgren's readministration of the *Miranda* warnings does not render the defendant's confession admissible. The renewed warnings alone do not dispel the coercive effect of continued questioning. Lundgren's subsequent interrogation does not survive scrutiny under the analysis employed above; it is inseparable from the illegal questioning which occurred. The defendant's de-

[11] *Accord: People v. Grant, supra* note 3, at 376–77.

tailed confession to Lundgren is the tainted fruit of the earlier unconstitutional interrogation by Lundgren and is equally inadmissible. *Harrison v. United States,* 392 U.S. 219, 222–23 (1968) ; *Gilpin v. United States,* 415 F.2d 638, 641–42 (5th Cir. 1969) ; *Harney v. United States,* 407 F.2d 586, 589–90 (5th Cir. 1969) ; *United States ex rel. Williams v. Twomey,* 467 F.2d 1248, 1252 (7th Cir. 1972) ; *Evans v. United States,* 375 F.2d 355, 360–61 (8th Cir. 1967) ; *United States v. Massey,* 437 F. Supp. 843, 856–59, 862 (M.D. Fla. 1977).

Accordingly, we reverse. Because of our holding, we do not reach the defendant's other contentions.

*By the Court.*—Judgment reversed and cause remanded for a new trial, with the instruction that the defendant's confession be suppressed as evidence.

COFFEY, J. *(concurring)*. In this case, the mistakes of the sheriff's department have resulted in setting aside the conviction of an obviously guilty defendant. Let us hope they have cost the people of this state nothing more than the expense of a new trial. I agree that the defendant's request for counsel before further questioning was not scrupulously honored. I agree that his confession must be excluded for this reason, even though it was freely and voluntarily given as a matter of fact. The decisions of the United States Supreme Court in *Miranda v. Arizona,* 384 U.S. 436 (1966) and *Michigan v. Mosley,* 423 U.S. 96 (1975) are directly in point and controlling. I do not agree, however, with the majority's discussion of the *Mosley* time factor as applied to the facts of this case. I also disagree with the factors which the majority requires to be considered "in addition" to the five *Mosley* factors.

The majority says that no significant period of time elapsed between the times the defendant requested counsel and the time that the questioning resumed. The evi-

dence shows that Lundgren left the interrogation room to convey the defendant's request for counsel to a sheriff's officer. He was gone 10 to 20 minutes. In *Leach v. State,* 83 Wis.2d 199, 265 N.W.2d 495 (1978) this court approved a waiver of counsel which was given after a 10 to 20 minute break in questioning. The purpose of the *Mosley* time factor, as I understand it, is to allow the defendant a cooling-off period before he again waives his right to remain silent. The majority acknowledges that the *Mosley* factors are not to be woodenly applied; yet, by its failure to determine whether the defendant's will was in fact undermined, it applies the time factor as if carved in stone.

The majority introduces, I hope for prospective application only, alternative rules for determining whether the authorities have scrupulously honored the defendant's request for counsel before renewing interrogation. The defendant must be allowed to call an attorney, or the authorities shall call one for him. If the authorities choose the second alternative, they must advise him of the steps they have taken to accommodate his request. Suppose a defendant is indigent. Who is to pay for the stationhouse consultation? Suppose a defendant is not indigent. Is he to pay for a lawyer not of his own choosing, or are the authorities required to contact the lawyer he requests? Further, if the defendant is the subject of a criminal inquiry in an unfamiliar area, are the authorities to choose a lawyer's name indiscriminately from the phone book and thus be subject to a future ineffective counsel challenge if the lawyer proves to be unacceptable? Could the officer also then be suspect of ambulance chasing or soliciting legal representation for the accused? It is my firm conviction that law enforcement officers, for their own protection, in light of the myriad of lawsuits, accusations and challenges

that they have been subjected to, should stay clear of any such implications and avoid the appearance of impropriety. This problem arises under the language used in the majority opinion if law enforcement officers are to aid in the securing of legal assistance for any prisoner. Furthermore, is the defendant then forced to pay for a lawyer not of his choosing? Consider the predicament of the lawyer who is contacted. Is the attorney, under his oath, obligated to come to the station without knowing the client, without knowing who will pay for his fee or what difficulties he may incur when attempting to collect the same?

The new factors announced by the majority do not complement the *Mosley* factors. They are replacements. In effect, they constitute a *per se* rule that no further questioning take place after a suspect has requested an attorney. These factors are not required by any decision of the United States Supreme Court. I do not feel they are necessary to this decision. They should not be adopted by the majority as the law of this state.

I am authorized to state that Justice CONNOR T. HANSEN joins in this concurrence.