**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James Thomas CHERRY,
Defendant-Appellant.**

No. 85–1561.

United States Court of Appeals,
Fifth Circuit.

July 14, 1986.

Rehearing Denied Aug. 19, 1986.

---

Robert Ramos, First Asst., Lucien B. Campbell, Federal Public Defender, El Paso, Tex., for defendant-appellant.

Maury S. Epner, Washington, D.C., Helen M. Eversberg, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before WILLIAMS, JOLLY and HIGGINBOTHAM, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

A jury convicted appellant James Thomas Cherry of second-degree murder in the United States District Court for the Western District of Texas. 18 U.S.C. § 111. Cherry now appeals his conviction. The only issue he raises is admission into evidence of the murder weapon (a .32 caliber pistol), a pistol case, and some .32 caliber bullets (hereinafter collectively referred to as the "murder weapon"). He claims the weapon and accompanying items were illegally obtained as "fruit" of his illegal arrest or "fruit" of the investigating authorities' failure to cease interrogating him after his request for counsel. Upon a review of the record and applicable law, we hold that the murder weapon was properly admitted into evidence. We, therefore, affirm Cherry's conviction.

## I. FACTS AND PRIOR PROCEEDINGS

This case is now before this Court for the third time. A review of the facts and prior proceedings is necessary to understanding the issues in the present appeal.

On December 6, 1982, the body of Jesus Manriquez, an El Paso taxi driver, was

found on the Army base at Fort Bliss, Texas. Manriquez had been shot in the back of the neck with a .32 caliber pistol. On December 7, Manriquez's taxi cab was discovered on a downtown El Paso side street. Inside the cab, FBI agents discovered Cherry's military identification card and his Virginia driver's license.

Later that day, FBI agents asked the Army's Criminal Investigation Detachment (CID) at Fort Bliss to help them find Cherry. The CID agreed to help. FBI and CID agents then proceeded together to Cherry's company area. Cherry was found and was then driven off to CID headquarters for questioning. This custodial control over Cherry was later held to be an illegal arrest.

Upon arriving at CID headquarters, the investigating agents gave Cherry *Miranda*[1] warnings. Cherry indicated that he understood his rights and then signed a form acknowledging so. Cherry was interrogated for about an hour during which he denied committing the murder. After this period of interrogation, Cherry consented to a search of his cubicle in the barracks. The agents then proceeded to Cherry's barracks, taking Cherry along with them. A search of Cherry's locker and personal belongings turned up no inculpatory evidence. During the search, however, a billfold was located in one of the trash cans in the nearby latrine.[2] The billfold was later identified as belonging to the murder victim. The agents also undertook to search the space between the interior ceiling above Cherry's cubicle and the roof. While attempting to boost themselves up to inspect this area, the agents found a sneaker footprint on top of Cherry's dresser. The agents then climbed up to ceiling level and removed one panel comprising the ceiling and attempted to scan the area. Because it was dark, however, they soon suspended their attempt.

The agents then returned Cherry to CID headquarters. At that time, the FBI agents learned that the last location to which the victim's cab had been dispatched was Cherry's barracks. The FBI and CID agents decided Cherry should be kept in custody. There was quite a bit of discussion as to who should do so. It was eventually agreed that he should be kept under CID control because it was decided there would then be no need to secure an arrest warrant.

Cherry spent the night in a holding cell at the military police station at Fort Bliss. Members of his unit provided him with bedding and canned rations. At 11:00 a.m. the next morning, interrogation began again. Cherry once more was informed of his *Miranda* rights. He again signed a written waiver of these rights. After the interrogation had proceeded for awhile, however, Cherry remarked that "maybe I should talk to an attorney before I make a further statement." The FBI agents informed Cherry that an attorney would probably counsel him to remain silent, but they did not attempt to provide him an attorney. They then asked Cherry if he wanted to be alone to consider whether to make any further statement. Cherry instead asked to see a sergeant assigned to CID headquarters with whom he had talked earlier. After a short search, it was discovered that this sergeant had gone off duty and had been replaced by another sergeant. When informed of this fact, Cherry asked to see this other sergeant.

A few minutes later, while waiting for this sergeant to arrive, the FBI agents informed Cherry of new evidence they had uncovered connecting him to the murder. In particular, they told Cherry that some soldiers had seen him in possession of a .32 caliber pistol, and they then asked him why he had denied having a gun. Cherry's response was to ask, "haven't you found the gun yet?" He then told the agents that the murder weapon was hidden in the ceil-

---

1. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. Cherry's barracks formed an "H" shape. The two sides of the "H" comprised the living quarters of the servicemen, and the crossbar the latrine.

ing space above his cubicle. Cherry then confessed to the murder and signed a written consent to a second search of his cubicle. The agents conducting a more complete search of the area above the false ceiling found the .32 caliber pistol, thirteen .32 caliber bullets, and a pistol case where Cherry had indicated they would be.

Cherry subsequently was convicted of second degree murder and sentenced to thirty years in prison. On appeal, this Court reversed his conviction because Cherry's confession had been obtained in violation of his rights under *Miranda* and *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). *U.S. v. Cherry*, 733 F.2d 1124, 1129 (5th Cir.1984) (*Cherry I*). Our colleague, Judge Randall, writing for the panel, held that the violation of Cherry's rights had occurred when the FBI agents continued to question him after his "equivocal" request for counsel. *Id.* at 1132. The Court also held in *Cherry I* that the *Miranda* violation had tainted Cherry's consent to the second search.

Cherry was then prosecuted again. Prior to the start of the second trial, Cherry moved to suppress all evidence obtained as a consequence of his arrest. The arrest, Cherry argued, was without probable cause and was in violation of his constitutional rights under the Fourth Amendment. The evidence derived from his arrest, therefore, was excludable as the "poisoned fruit" of the unlawful arrest. The district court ruled that although appellant's incriminating statements were inadmissible, the murder weapon could be entered into evidence under the "inevitable discovery" exception to the exclusionary rule. *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed. 2d 377 (1984).

On appeal, this Court, in another opinion written by Judge Randall, rejected the district court's application of the inevitable discovery exception. *U.S. v. Cherry*, 759 F.2d 1196 (5th Cir.1985) (Cherry II). The Court, however, in light of *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), withdrew its prior holding that Cherry's consent to the second

search was tainted by the *Miranda* violation. The Court then remanded to the district court the issue of the admissibility of the murder weapon for reconsideration on two different grounds: First, was Cherry's consent to the second search tainted by his illegal arrest? Second, under *Elstad* should the murder weapon be excluded because of the *Miranda* violation?

With respect to whether Cherry's illegal arrest tainted his subsequent consent to the second search, the issue remanded required consideration of whether Cherry's consent was obtained through the exploitation of his illegal arrest. This inquiry involved the voluntariness of Cherry's consent and the degree of attenuation between his illegal arrest and his consent to the search.

The remanded issue with respect to the *Miranda* violation required inquiry as to whether Cherry's consent to the search and his other incriminating statements were obtained in violation of his right against self-incrimination under the Fifth Amendment. The Supreme Court holding in *Elstad* mandated this inquiry because in that case the Court held that an infringement upon a suspect's *Miranda* rights is not automatically an infringement upon his Fifth Amendment rights. The Supreme Court held that in some situations evidence obtained as a result of a *Miranda* violation was nevertheless admissible at trial unless there was a Fifth Amendment self-incrimination violation as well. Thus, the standard by which the Fifth Amendment had to be evaluated in this case was whether Cherry's consent and other statements were or were not voluntarily made. If voluntarily given, the derivative evidence (*i.e.*, the murder weapon) discovered as a result of Cherry's statements and his consent to search would be admissible.

Following these guidelines, the district court ruled that the murder weapon was admissible. The district court found no Fourth Amendment unreasonable search and seizure violation because it held that Cherry had no reasonable expectation of privacy with regard to the ceiling space

above his cubicle. As an alternative ground, the court found no Fourth Amendment violation by concluding that Cherry's consent to the second search was voluntarily given and sufficiently attenuated from the illegal arrest.

Relying on *Elstad,* the district court also ruled that Cherry's Fifth Amendment right against self-incrimination had not been violated in obtaining and using the consent to search. The court found that the discovery of the murder weapon was not tainted by the investigators' *Miranda* violation. The district court ruled that there had been no constitutional infraction in this instance, and Cherry's voluntary consent to the search of his cubicle was not therefore barred as a fruit of the *Miranda* violation.

On appeal, we are asked to review both of Cherry's objections to the admissibility at trial of the murder weapon.[3]

## II. INADMISSIBILITY CLAIM BASED UPON ILLEGAL ARREST

■ Cherry urges two theories as to why the introduction of the murder weapon at his trial was barred under the exclusionary rule because it was obtained by a search and seizure which violated the Fourth Amendment. First, he contends that his consent to the second search of his cubicle that resulted in the discovery of the murder weapon grew out of his illegal arrest as the "fruit" of a Fourth Amendment violation. Second, Cherry argues that the second warrantless search of his cubicle was without probable cause and therefore unconstitutionally infringed upon his expectation of privacy under the Fourth Amendment. The district court rejected both theories in ruling that the murder weapon was admissible. We turn now to the first argument.

As one means of discouraging police from improperly exercising their power to arrest individuals, the Supreme Court holds that there is an exclusionary rule under the Fourth Amendment with regard to evidence derived from an illegal arrest. Ordinarily, such evidence will be excluded as the "fruit" of unconstitutional conduct. *Taylor v. Alabama,* 457 U.S. 687, 690, 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314 (1982); *Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963). Nevertheless, there are situations in which evidence obtained after an illegal arrest may become so "attenuated" from the illegal arrest that the taint becomes "dissipated." *Wong Sun,* 371 U.S. at 487, 83 S.Ct. at 417. The fundamental issue, therefore, is whether the effect of the illegal arrest had so dissipated that Cherry's consent to the search of his cubicle was " 'sufficiently an act of free will to purge the primary taint.' " *Brown v. Illinois,* 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975), *quoting Wong Sun,* 371 U.S. at 486, 83 S.Ct. at 416.

The central inquiry regarding the dissipation of the taint of the illegal arrest is the voluntariness of the consent to search obtained from Cherry. *Taylor,* 457 U.S. at 690, 120 S.Ct. at 2668; *Brown,* 422 U.S. at 604, 95 S.Ct. at 2262. Voluntariness is "determined by the totality of all the circumstances." *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980); *see also Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Voluntariness is a question of fact to be decided by the trial court and upheld on appeal unless clearly erroneous. *United States v. Davis,* 749 F.2d 292, 294 (5th Cir.1985); *United States v. Robinson,* 625 F.2d 1211, 1218 (5th Cir.1980).

**3.** Cherry also contends that his consent to the second search should be excluded as the fruit of a Sixth Amendment violation—the authorities' failure to provide him counsel at the time he requested an attorney. The Sixth Amendment right to counsel, however, attaches only once judicial proceedings are initiated against a person. *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977). The accused's right to counsel during custodial interrogation arises instead under the Fifth and Fourteenth Amendments. *Edwards,* 451 U.S. at 482, 101 S.Ct. at 1883. Because no formal proceeding against Cherry had been commenced in this case, we hold that his Sixth Amendment claim is without foundation.

The district court found that Cherry, a high school graduate, was "mentally capable of understanding his rights and of giving a voluntary waiver of those rights." Cherry's right to refuse consent and to remain silent had been thoroughly explained to him. *See United States v. Troutman,* 590 F.2d 604, 606 (5th Cir. 1979). In addition, Cherry's consent was not coerced by physical or mental abuse, or intimidation. *Cf. United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976). Cherry was also twice given full *Miranda* warnings. Although his *Miranda* rights were infringed when he was not provided with an attorney following his equivocal request for one, the knowledge required of the *Miranda* warnings had been imparted to him thoroughly. This knowledge and understanding is critical to the issue of voluntariness of the consent to search. A *Miranda* violation is not in all instances a dispositive indication of involuntariness.[4] *See Elstad,* 105 S.Ct. at 1292.

Other factors must also be considered in order to evaluate the admissibility of evidence derived from the exploitation of an illegal arrest. These are: (1) the temporal proximity between the arrest and Cherry's consent to search; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of official misconduct. *Brown,* 422 U.S. at 603, 95 S.Ct. at 2261. There is no particular way to rank the importance of each factor. The totality of their effect must be evaluated in relation to the particular facts of each case. *Cherry II,* 759 F.2d at 1211. Considered together, we find that these factors show that Cherry's consent to search his cubicle was sufficiently free of any taint arising from his illegal arrest to permit the evidence discovered to be admitted at trial.

First, Cherry's second consent to search was separated from the illegal arrest by the substantial time period of approximately twenty-four hours.[5] This varies significantly from the situations presented in cases such as *Brown* (2 hours) and *Taylor* (6 hours). *Cf. United States v. Manuel,* 706 F.2d 908, 912 (9th Cir.1983) (delay of 18 hours between illegal arrest and confession was sufficient to show attenuation of taint).

Second, important intervening circumstances between the arrest and the consent developed. For example, during the time that Cherry was in custody, investigating agents independently acquired additional inculpatory evidence that the taxi had last been dispatched to Cherry's barracks and that Cherry had been seen with a pistol of the same caliber as the murder weapon. This additional evidence would have been enough to establish probable cause for Cherry's continued detention. *Cherry II,* 759 F.2d at 1212. The development of independently procured probable cause following an illegal arrest is a critical factor attenuating the taint of the initial illegal arrest. *See United States v. Nooks,* 446 F.2d 1283, 1287 (5th Cir.), *cert. denied sub nom. Hughes v. United States,* 404 U.S. 945, 92 S.Ct. 299, 30 L.Ed.2d 261 (1971). It is also apparent from the record that Cherry realized that the authorities were developing a strong case against him and thus that it might be in his interest to cooperate with them.

Finally, we cannot find that there was any flagrant official misconduct. Cherry was not subjected to continuous questioning during his detention. He was allowed to sleep and to consider his predicament. There was no physical nor mental coercion or intimidation. Although the agents did not properly deal with Cherry's equivocal request for counsel, their error was neither purposeful nor flagrant. They asked Cherry whether he wanted some time alone before making any additional statements.

---

**4.** The implications of the effect of the *Miranda* violation independent of the illegal arrest are considered in the next section of this opinion.

**5.** Cherry was taken into custody at 1:00 p.m. on December 7, 1982. Sergeant Crider, the first sergeant Cherry had wanted to talk to, had been relieved at about 12:15 p.m. on December 8, 1982. Cherry's interrogation ended at 2:15 p.m. that day. Thus his consent was given sometime in this two hour period.

At this point, Cherry changed his mind and asked to see a sergeant known to him. The investigating agents then suspended questioning until the additional evidence was presented to him that he had been seen with a gun in his possession. The agents could have in good faith, although erroneously, believed Cherry had retracted his request for counsel.

We hold that Cherry's consent to the second search was not tainted by his illegal arrest and thus we uphold the district court's judgment. Consequently, the murder weapon was properly admissible in evidence as against that claim. It, therefore, is unnecessary for us to decide the question of whether Cherry possessed a reasonable expectation of privacy with regard to the space in the ceiling above his cubicle since that claim is predicated upon a finding of an invalid consent to search growing out of the illegal arrest.

## III. INADMISSIBILITY CLAIM BASED UPON MIRANDA VIOLATION

This Court has previously ruled that the failure of the investigating agents, following Cherry's equivocal request for counsel, to cease all interrogation until they could clarify Cherry's request or provide him with counsel violated his rights under *Miranda* and *Edwards*. *Cherry I*, 733 F.2d at 1132. We held, therefore, that Cherry's subsequent confession had been illegally obtained and could not be used at trial. *Id.*

The Court in *Cherry I* also held that Cherry's consent to the second search that led to the discovery of the murder weapon was also fatally tainted by this violation. *Id.* n. 15. Under this analysis, the murder weapon was therefore excludable as a "fruit" of the *Miranda* violation. In *Cherry II*, however, we withdrew our holding regarding the legality of Cherry's consent in light of the Supreme Court's holding in *Elstad*, which was decided after *Cherry I*. 759 F.2d at 1210. Upon remand, the district ruled that Cherry's consent was valid notwithstanding the *Miranda* violation and that the murder weapon was admissible at

trial. Upon a review of *Elstad* and other recent Supreme Court decisions, we agree.

■ *Elstad* held that a *Miranda* violation creates a presumption that the suspect's Fifth Amendment right against self-incrimination has been violated. But the presumption may be overcome by the circumstances of a particular case. The *Miranda* exclusionary rule "serves the Fifth Amendment and sweeps more broadly than Fifth Amendment itself." *Elstad*, 470 U.S. at ——, 105 S.Ct. at 1292. The Supreme Court concluded that claims based upon *Miranda* violations are not always Fifth Amendment violations. Therefore, they do not automatically establish the inadmissibility of the evidence obtained.

Since *Elstad* makes clear that failure to give or carry out the obligation of *Miranda* warnings in and of itself is not a constitutional infringement, the test by which to evaluate whether a defendant's underlying Fifth Amendment right against compelled testimony has been violated is still the " 'due process voluntariness test.' " *Elstad*, 470 U.S. at ——, 105 S.Ct. at 1293, *quoting* Schulhofer, Confessions and the Court, 79 Mich.L.R. 865, 877 (1981). In *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), for example, the Supreme Court held that a confession obtained in violation of *Miranda* could nonetheless be used for "impeachment" purposes on cross-examination so long as it actually had been voluntarily made. *Id.* at 225 & n. 2, 91 S.Ct. at 645 & n. 2.

This due process voluntariness inquiry applies to the case before us since the issue is the use of derivative evidence obtained through the exploitation of statements obtained in violation of *Miranda*. In *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), the Supreme Court held that the testimony of a prosecution witness whose identity was discovered as a result of a statement obtained from the defendant in violation of *Miranda* would not be suppressed. The Supreme Court noted that the statement had been voluntarily given and that *Miranda* did not protect against such a voluntary naming of a

potential witness against an accused. The Supreme Court in *Tucker* reasoned that neither the Fifth Amendment interest in assuring trustworthy evidence nor the general policy of deterring improper police conduct would be furthered by suppressing the testimony of a witness so identified. The Court thus rejected a "fruits" doctrine for the *Miranda* violation under the facts of that case.

■ The policies underlying the rejection of a fruits doctrine in *Tucker* apply with equal force to the discovery of the murder weapon in this case. As the Supreme Court stated that in *Tucker:*

> [T]he introduction of the third-party witness' testimony did not violate Tucker's Fifth Amendment rights ... [T]his reasoning applies with equal force when the alleged 'fruit' of a noncoercive *Miranda* violation is neither a witness nor *an article of evidence* but the accused's own voluntary testimony.

*Elstad,* 470 U.S. at ——, 105 S.Ct. at 1293 (emphasis added). Inasmuch as we find that Cherry's statement and consent were voluntarily given, we are bound by the reasoning of *Tucker* and *Elstad.* Cherry's Fifth Amendment right against self-incrimination was not violated in this case. We decline to hold that the murder weapon should be suppressed as a "fruit" of a *Miranda* violation.[6]

### IV. CONCLUSION

We hold that the murder weapon was properly admitted in evidence at Cherry's trial. We affirm Cherry's conviction.

AFFIRMED.

---

**6.** We need to mention briefly Cherry's contention that his case is among those distinguished from *Elstad* in footnote 3 of Justice O'Connor's opinion. The relevant portion of that footnote for purposes of this case reads as follows:

> Likewise inapposite are the cases the dissent cites concerning suspects whose invocation of their rights to remain silent and to have counsel present were flatly ignored while police subjected them to continued interrogation. (citations omitted).

Cherry's argument is unpersuasive. The underlying concern presented in those cases were

confessions obtained from defendant's in violation of *Miranda* and *Edwards.* As noted in our opinion, a confession so obtained must be suppressed because of the conclusive presumption of involuntariness created by the *Miranda* violation. In this case, Cherry's confession was properly suppressed for this reason. As we note in our opinion, however, different interests prevail when we evaluate derivative evidence obtained through the exploitation of statements obtained in violation of *Miranda* and *Edwards* but which, nevertheless, were voluntary.