STATE of Wisconsin, Plaintiff-Respondent,

v.

Dirk E. HARRIS, Defendant-Appellant.†

Court of Appeals

*No. 93–0730–CR. Submitted on briefs December 15, 1994.—Decided November 8, 1994.*

(Also reported in 525 N.W.2d 334.)

†Petition to review granted.

For the defendant-appellant the cause was submitted on the briefs of *William O. Marquis* of Milwaukee.

For the plaintiff-respondent the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *G.M. Posner-Weber*, assistant attorney general, of Madison.

Before Wedemeyer, P.J., Sullivan and Schudson, JJ.

SCHUDSON, J.   Dirk E. Harris appeals from a judgment of conviction for first-degree murder and armed robbery, both as party to a crime, following a jury trial.[1] Harris argues that the trial court erred in allowing introduction of the murder weapon and other items that were recovered as the result of information he provided to police in a confession that the trial court suppressed. He also argues that the jury deliberations were tainted by the foreperson's knowledge of a newspaper article that reported the suppression of his confession. We conclude that the trial court correctly determined the admissibility of evidence. We also conclude that Harris waived his challenge to the alleged taint of the juror. Therefore, we affirm.[2]

---

[1] Harris was convicted on July 18, 1990, after enactment of Wisconsin's revised homicide statutes. The offense date, however, was December 4, 1988, before the revisions. Therefore, this case was prosecuted under the previous § 940.01, STATS. (1987-1988).

[2] The Honorable William D. Gardner presided over the jury trial; the Honorable Lee E. Wells denied Harris's postconviction motion.

## I. FACTUAL BACKGROUND

At approximately 4:15 a.m. on December 4, 1988, the dead body of Dennis Owens was discovered on a Milwaukee street. He was found without the wallet, credit cards and money he had carried earlier that evening when he was a customer at a nearby tavern. Multiple gunshot wounds to the head and chest, fired from short range, caused Owens's death.

Later that day, Harris purchased jewelry with one of Owens's credit cards, drove Owens's car, and told a friend that he would be leaving Wisconsin because he was in trouble. The next day, Harris told his mother that he was in trouble and needed money to leave town. When he met his mother at a local tavern, he showed her Owens's identification and credit cards. Owens's identification cards and the original license plates from Owens's car were subsequently found during a garbage search at Harris's home.

Harris's accomplice, James Malone,[3] testified that on the night of December 3, he met Harris at a tavern and then went to Harris's home where Harris obtained a gun and ammunition. After going to another bar, they left and Harris said, "Let's go down to the fag bars and roll a queer." They then drove to the area near the location where Owens's body eventually was found. Malone remained in the car and fell asleep. A short time later, Harris returned, woke Malone, and told him that he "just shot a nigger." They then left the scene but returned later when Harris told Malone that he (Malone) must shoot the victim. Malone saw that

---

[3] This court affirmed Malone's conviction for armed robbery, party to a crime, stemming from this incident. *State v. Malone*, No. 92-0427-CR, unpublished slip op. (Wis. Ct. App. January 12, 1993).

Owens had been shot and refused to shoot him again. Harris then went through Owens's pockets and shot him two more times. The next day, Harris drove to Malone's home, told him that the victim was a television camera man, and invited Malone to go shopping with the victim's credit cards. Shortly thereafter, Harris left Milwaukee but was apprehended in Amarillo, Texas.

Amarillo police gave Harris the *Miranda*[4] warnings. While still in custody in Amarillo, Harris was contacted by Wisconsin Assistant State Public Defender Kathy Stilling, who had represented him in a previous case. Recognizing her former client from the news accounts of the Owens killing, she telephoned Harris and advised him to make no statements to police. Learning that Milwaukee Police Detective Raymond Sucik would be going to Amarillo to return Harris to Milwaukee, Ms. Stilling also informed Detective Sucik that Harris would be making no statements to police.

On December 8, when Detective Sucik and Milwaukee Police Detective Roman Blazer met Harris in Amarillo, Sucik repeatedly warned Harris that he had counsel and need not speak with them. Nevertheless, Harris wanted to talk, so Detective Blazer provided the *Miranda* warnings, and they questioned him extensively. Harris confessed. Based entirely on information that Harris gave to the Milwaukee detectives in Amarillo, police went to a sewer near Harris's residence where they recovered the murder weapon, a box of bullets, and keys to Owens's apartment.

Harris moved to suppress the confession and physical evidence. The trial court ordered suppression of the

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

confession in the State's case-in-chief, concluding that, under *Miranda*, the detectives violated Harris's right to counsel.[5] The trial court also concluded, however, that the confession was voluntary. The trial court explained:

> On the other hand according to traditional standards the defendant's statements to the police was based on a voluntary and knowing waiver of his right to counsel. I do not believe the police questioning coerced the defendant into making his waiver nor were any threats or promises made. The defendant was in custody and Miranda was clearly applicable.
>
> The defendant was fully and lawfully Mirandized and elected to waive his rights and give a statement. The defendant was a twenty year old with a high school equivalency, had served in the Marines, attended some post-high school vocational education, and had prior police contacts. There were no signs of mental or emotional disorders, the weeping [by Harris during the questioning] appearing to be appropriate. The defendant was offered food and drink, and was interviewed in a setting that was not psychologically threatening. Under the totality of the circumstances the court finds defendant's waiver of his constitutional rights to be a voluntary expression of an unconstrained will.[6]

---

[5] "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning." *Miranda*, 384 U.S. at 474. The trial court's conclusion that the detectives violated Harris's right to counsel is not an issue in this appeal.

[6] Consequently, although the trial court suppressed Harris's statement in the State's case-in-chief, the trial court also

The trial court denied Harris's motion to suppress the physical evidence, however, explaining:

> I've already determined that the statement given by the defendant was under the ordinary rules a voluntary statement and whereas the 4th Amendment with its rule of suppression is a rule of law that really is created to deter unlawful police conduct.
>
> When you get into the 5th and 6th Amendment questions, the question is one of whether or not subsequent information is reliable or trustworthy and so I have just sidelined a quote from Michigan versus Tucker for instance. This is as cited in Sangineto-Miranda,[7] "To be sure, the admission of non-testimonial physical evidence which is derived from a Miranda violation may marginally reduce ... the incentives to administer Miranda's prophylactic warnings."
>
> . . ..
>
> It says, "On the other hand, we believe the arguable benefits from excluding such evidence by way of possibly deterring police conduct that might compel admissions are far outweighed by the advantages of having relevant and probative evidence not obtained by actual coercion available at criminal trials to aid in the pursuit of truth," citing Michigan versus Tucker.[8] "Whereas the goal of the 4th Amendment's exclusionary rule is to deter unlawful police conduct, the goal of the 5th Amendment's exclusionary rule is to assure trustworthy evidence. In the vast majority of cases, as in our

---

ruled that it could be introduced for impeachment should Harris choose to testify. Harris did not testify at his trial, and his statement never was introduced.

[7] *United States v. Sangineto-Miranda*, 859 F.2d 1501 (6th Cir. 1988).

[8] *Michigan v. Tucker*, 417 U.S. 433 (1974).

case, there is plainly no reason to believe that non-testimonial physical evidence derived from uncounselled statements is untrustworthy."

I adopt that logic and apply it to this case and hold that the State may introduce the gun and keys [and a box of bullets] found even though it's undisputed by the State that they were found as a result of defendant's confession which I found to be violative of the 5th and 6th Amendment.

## II. ADMISSIBILITY OF DERIVATIVE, NON-TESTIMONIAL EVIDENCE

Harris offers two separate but related arguments in challenging the trial court's admission of the evidence. First, Harris argues that the trial court erred in concluding that Harris's statement was voluntary. Thus, he contends, the physical evidence was "fruit of a poisonous tree" (the involuntary confession) and must be suppressed. Second, Harris argues that even if Harris's confession was voluntary, we still should conclude that such "derivative evidence" is inadmissible because it was discovered as a result of a tainted, suppressed confession.

In response, the State implicitly agrees with Harris's argument that if, in fact, his confession was involuntary, then the derivative evidence would be inadmissible.[9] The State argues, however, that the trial court's conclusion that the confession was volun-

---

[9] The State writes:

Evidence derived from a statement taken in violation of *Miranda* is admissible if the statement was constitutionally voluntary. The fruit of the poisonous tree doctrine may be used to exclude derivative evidence only if there is proof of actual coercion by law enforcement officers or proof of other circumstances designed to overbear the suspect's will. These conclusions flow from the decision of the United States Supreme Court in *Elstad* and from state

tary is fully supported by the testimony at the suppression hearing. Accordingly, the State then goes on to argue, "this court should conclude that physical evidence derived from a statement taken in violation of *Miranda* is admissible if the statement was voluntarily made." The State also believes, however, that such a holding would require this court to "conclude that *Wentela* [*v. State*, 95 Wis. 2d 283, 290 N.W.2d 312 (1980)] is no longer good law."

We conclude that the trial court's ruling that Harris's confession was voluntary is supported by the evidence at the suppression hearing. Thus, we reach the issue of whether *non-testimonial* derivative evidence, discovered as the result of a *voluntary* confession obtained in violation of *Miranda*, is admissible. We do so in this case, however, without reaching any conclusion about the continuing viability of *Wentela* given that *Wentela* specifically considered derivative *testimonial* evidence.

## A. Voluntariness

We first consider Harris's argument that the trial court erred in concluding that his confession was voluntary. Harris argues that the conduct of the police detectives "transcended a simple violation of his *Miranda* rights and represents a full blown coercion of Harris to make a statement he had no inclination or desire to make." He maintains that the detectives "hit upon every possible opening they had to get Harris to talk in spite of his initial declaration" that he would not make any statement. In particular, he alleges that the detectives:

and federal decisions applying *Elstad* to questions involving the admissibility of derivative evidence.

171

talked at length about the case itself, including unsolicited comments about Harris'[s] mother designed to pique his concern, including the inference at least on Harris'[s] part that she might be charged with a crime. They talked about his father's bad character, including his reputation for carrying a gun in his boot. They talked about both James Malone and Harris'[s] cousin Glenn Conroy as other actors in the alleged crime. The detectives conceded that by the time that they were done Harris was scared, nervous and reduced to tears.

(Record references omitted.)

At the suppression hearing Detective Sucik and Detective Blazer testified that they had no intention of questioning Harris, having been informed that he had an attorney who had advised him to make no statement. Further, Detective Sucik testified that when Harris indicated his desire to make a statement, he (Sucik) repeatedly reminded him of his request for counsel, and warned him that he need not make any statement before conferring with counsel. When, despite those warnings, Harris insisted on making a statement, the detectives testified that Harris then was given his *Miranda* rights and that he waived them.

Detectives Sucik and Blazer acknowledged that their interrogation of Harris did reach subjects relating to his mother, father, accomplice, and cousin, but denied any coercive references to them. They acknowledged that Harris cried, but characterized his tears, in part, as ones of relief, and as an emotional response appropriate to Harris's nervousness and to the subject of the interrogation. Describing the unremarkable setting and circumstances of the interrogation at the Amarillo police station, they testified that they carried no guns, that Harris was not in cuffs, and that Harris's

physical comforts were accommodated. They said they made no threats or promises. Detective Sucik testified that Harris carefully reviewed the written summary of his confession before signing it.

Harris also testified at the suppression hearing. He stated that he had eaten that day before being removed from his cell and being brought to the detectives, but that he was not allowed to eat again until the interrogation was over. He also said that although the detectives never denied any request to use the bathroom, he was not allowed to do so until after the interrogation. Harris also testified that the detectives "said that they could make [the flight to Milwaukee] real hard on me by putting that leg brace thing they described on me." He emphasized that the detectives used his mother as a "pivot point," and that he started crying when they threatened that his failure to cooperate could lead to criminal charges against her.

A statement is not involuntary, in violation of a person's Fifth Amendment rights, unless it has been obtained by coercive police activity. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *State v. Clappes*, 136 Wis. 2d 222, 235-236, 239-241, 401 N.W.2d 759, 765, 767-768 (1987). The initial inquiry to determine the voluntariness of a statement focuses on whether the police used actual coercive or improper pressures to compel a person to make incriminating statements. *Clappes*, 136 Wis. 2d at 235-236, 401 N.W.2d at 765. If a defendant fails to establish that the police used actual coercive or improper pressures to compel a statement, the trial court need not undertake the remaining balancing analysis of weighing the personal characteristics of the defendant against the improper or coercive police conduct that has occurred to deter-

mine whether the challenged statement was voluntary. *See id.*, 136 Wis. 2d at 239-240, 401 N.W.2d at 767; *State v. Pheil*, 152 Wis. 2d 523, 535, 449 N.W.2d 858, 863 (Ct. App. 1989).

The trial court's findings of fact will not be disturbed on appeal unless they are clearly erroneous. *Clappes*, 136 Wis. 2d at 235, 401 N.W.2d at 765. The evidentiary facts are "the circumstances surrounding the giving of the oral statement." *State v. Woods*, 117 Wis. 2d 701, 714-715, 345 N.W.2d 457, 463-464 (1984). These facts are "what occurred in the interrogation room when [the suspect] confessed." *State v. Owens*, 148 Wis. 2d 922, 927, 436 N.W.2d 869, 871 (1989). Any disputes regarding the factual circumstances surrounding a suspect's statement must be resolved in favor of the trial court's findings. *Clappes*, 136 Wis. 2d at 235, 401 N.W.2d at 765. Whether these historical or evidentiary facts pass constitutional muster, however, is a question we independently review. *Id.*

Although Harris argues that the trial court erred because it "totally ignored the police behavior in this case," the record demonstrates otherwise. The trial court made factual findings that resolved inconsistencies in the testimony. For example, the trial court found that Harris's "weeping appear[ed] to be appropriate," and that he "was offered food and drink, and was interviewed in a setting that was not psychologically threatening." It was within the province of the trial court to evaluate the credibility of the witnesses and to resolve differences in their testimony. The trial court's findings are amply supported by the record; they are not clearly erroneous. Therefore, we continue our consideration of the issue in this case, accepting the

trial court's conclusion that Harris's suppressed confession was voluntary.

## B.  Derivative, Non-Testimonial Evidence

Arguing that "[e]vidence derived from a statement taken in violation of *Miranda* is admissible if the statement was constitutionally voluntary," the State relies primarily on *Oregon v. Elstad*, 470 U.S. 298 (1985). In that case, officers investigating a burglary first questioned Elstad in his house without providing *Miranda* warnings and obtained an uncoerced, incriminating statement. *Id.* at 300-301. Approximately one hour later, at the Sheriff's headquarters, officers provided the *Miranda* warnings and obtained a second incriminating statement. *Id.* at 301-302. Elstad argued for suppression of both statements, contending that "the statement he made in response to questioning at his house 'let the cat out of the bag' . . . and tainted the subsequent confession as 'fruit of the poisonous tree.' " *Id.* at 302. Thus, the Supreme Court considered "whether the Self-Incrimination Clause of the Fifth Amendment requires the suppression of a confession, made after proper Miranda warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the defendant." *Id.* at 303. The Supreme Court held that the initial failure to provide the *Miranda* warnings did not require suppression of the subsequent confession. The Court reasoned:

> If errors are made by law enforcement officers in administering the prophylactic Miranda procedures, they should not breed the same irremediable consequences as police infringement of the Fifth

Amendment itself. It is an unwarned extension of Miranda to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id.* at 309. The State argues, therefore, "The Court's reasoning in *Elstad* supports the conclusion that physical evidence derived from a statement taken in violation of *Miranda* should not be excluded as fruit of the poisonous tree if the statement was voluntarily made." We agree.

In *Wentela*, the Wisconsin Supreme Court suppressed a defendant's statement on the ground that it was "the tainted fruit of [an] earlier unconstitutional interrogation." *Id.*, 95 Wis. 2d at 299-300, 290 N.W.2d at 320. *Wentela*, like *Elstad*, considered the admissibility of derivative *testimonial* evidence obtained by police after a *Miranda* violation. Decided five years before the United States Supreme Court's decision in *Elstad*, *Wentela* did not have the benefit of *Elstad's* analysis. Therefore, the State argues, this court should conclude that *Wentela* is no longer good law and apply *Elstad* in its place.[10] Because of the distinguishing factor

[10] The State cites *State v. Esser*, 166 Wis. 2d 897, 905 n.5, 480 N.W.2d 541, 544 n.5 (Ct. App. 1992), for this court's authority to do so. In *Esser*, in defining the applicable burden of proof

between *Wentela* and the instant case, however, we deem it unnecessary and perhaps premature to do so.

■

*Wentela* specifically addressed the admissibility of derivative *testimonial* evidence. It is testimonial evidence on which the Fifth Amendment focuses in protecting against self-incrimination. *See Elstad*, 470 U.S. at 306-308. Thus, in this case involving physical evidence, we need not reconsider the *Wentela* holding in order to determine the impact of *Elstad* regarding physical evidence. We hold that derivative, *non-testimonial* evidence is admissible when its discovery results from a suppressed, voluntary confession.

Although no Wisconsin decision has addressed this specific issue, the Fifth Circuit Court of Appeals considered virtually identical circumstances in *United States v. Cherry*, 794 F.2d 201 (5th Cir. 1986), *cert. denied*, 479 U.S. 1056 (1987).[11] Cherry appealed his conviction for second-degree murder, arguing that the trial court erred in admitting a pistol (the murder weapon), a pistol case, and ammunition. *Id.*, 794 F.2d at 202. He contended that the gun and other items should have been suppressed as tainted "fruits"—of

in a *Miranda* hearing, we applied the standard articulated in *Colorado v. Connelly*, 479 U.S. 157 (1986). We stated:

> Usually we would certify a question of this magnitude to the Wisconsin Supreme Court for its determination. However, where the issue is so obviously governed by a controlling decision of the United States Supreme Court, we conclude that this court may appropriately address the matter.

*Esser*, 166 Wis. 2d at 905 n.5, 480 N.W.2d at 544 n.5.

[11] Cherry's appeals reached the Fifth Circuit in three stages. The preceding two appeals are *United States v. Cherry*, 733 F.2d 1124 (5th Cir. 1984); and *United States v. Cherry*, 759 F.2d 1196 (5th Cir. 1985).

both an illegal arrest and the failure of police to cease questioning him after he requested counsel. *Id.*

In the first appeal, the 5th Circuit Court of Appeals reversed Cherry's conviction, concluding that the trial court should have ordered suppression of Cherry's statement because it was obtained in violation of *Miranda. United States v. Cherry*, 733 F.2d 1124, 1132 (5th Cir. 1984). As in Harris's case, the *Miranda* violation consisted of continuing interrogation after Cherry's request for counsel.[12] As in Harris's case, Cherry's subsequent disclosures were not coerced, and did lead to the discovery of the gun and other evidence. In the second appeal, the court remanded Cherry's case for further fact-finding and consideration of the admissibility of the evidence, in light of the Supreme Court's decision in *Elstad. United States v. Cherry*, 759 F.2d 1196, 1210 (5th Cir. 1985). Finally, in the third appeal, the court allowed the gun and other evidence, explaining:

---

[12] This aspect of the case may have particular significance given that the violation in *United States v. Cherry*, 794 F.2d 201 (5th Cir. 1981), and in the instant case is somewhat different than the violation considered in *Oregon v. Elstad*, 470 U.S. 298 (1985). In *Elstad*, as we noted above, the Supreme Court concluded that the second confession was admissible, explaining:

> It is an unwarranted extension of Miranda to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent and voluntary and informed waiver is ineffective for some indeterminate period.

*Elstad*, 470 U.S. at 309. By contrast, in *Cherry* and the instant case, we encounter more than "a simple failure to administer the warnings." Instead, the *Miranda* warnings were initially administered and police pursued interrogation despite each defendant's invocation of his right to counsel.

*Elstad* held that a *Miranda* violation creates a presumption that the suspect's Fifth Amendment right against self-incrimination has been violated. But the presumption may be overcome by the circumstances of a particular case. The *Miranda* exclusionary rule "serves the Fifth Amendment and sweeps more broadly than Fifth Amendment itself." *Elstad*, 470 U.S. at —, 105 S.Ct. at 1292. The Supreme Court concluded that claims based upon *Miranda* violations are not always Fifth Amendment violations. Therefore, they do not automatically establish the inadmissibility of the evidence obtained.

Since *Elstad* makes clear that failure to give or carry out the obligation of *Miranda* warnings in and of itself is not a constitutional infringement, the test by which to evaluate whether a defendant's underlying Fifth Amendment right against compelled testimony has been violated is still the " 'due process voluntariness test.' "

This due process voluntariness inquiry applies to the case before us since the issue is the use of derivative evidence obtained through the exploitation of statements obtained in violation of *Miranda*. In *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), the Supreme Court held that the testimony of a prosecution witness whose identity was discovered as a result of a statement obtained from the defendant in violation of *Miranda* would not be suppressed. The Supreme Court noted that the statement had been voluntarily given and that *Miranda* did not protect against such a voluntary naming of a potential witness against an accused. The Supreme Court in *Tucker* reasoned that neither the Fifth Amendment interest in assuring trustworthy evidence nor the general policy of deterring improper police conduct would be furthered by suppressing the testimony of

179

a witness so identified. The Court thus rejected a "fruits" doctrine for the *Miranda* violation under the facts of that case.

The policies underlying the rejection of a fruits doctrine in *Tucker* apply with equal force to the discovery of the murder weapon in this case. As the Supreme Court stated in *Tucker*:

> [T]he introduction of a third-party witness' testimony did not violate Tucker's Fifth Amendment rights . . . [T]his reasoning applies with equal force when the alleged 'fruit' of a noncoercive *Miranda* violation is neither a witness nor *an article of evidence* but the accused's own voluntary testimony.

*Elstad*, 470 U.S. at —, 105 S.Ct. at 1293 (emphasis added). Inasmuch as we find that Cherry's statement and consent were voluntarily given, we are bound by the reasoning of *Tucker* and *Elstad*. Cherry's Fifth Amendment right against self-incrimination was not violated in this case. We decline to hold that the murder weapon should be suppressed as a "fruit" of a *Miranda* violation.

*Id.*, 794 F.2d at 207-208.

Similarly, in *U.S. v. Sangineto-Miranda*, 859 F.2d 1501 (6th Cir. 1988), a case on which the trial court relied, the Sixth Circuit Court of Appeals also applied *Elstad* to non-testimonial derivative evidence. In *Sangineto-Miranda*, the defendant challenged the denial of his motion to suppress narcotics found in his truck. Police had learned of the truck and its location from custodial statements taken in violation of *Miranda*. *Id.* at 1507. Rejecting the defendant's argument that such tainted evidence should have been suppressed, the court stated:

*Elstad* makes clear that a failure to administer *Miranda* warnings, without more, does not automatically require suppression of the "fruits" of the uncounseled statement. Where the uncounseled statement is voluntary, and thus not a product of "inherently coercive police tactics or methods offensive to due process," there is no Fifth Amendment violation and the "fruits" may be admissible in the Government's case in chief.

To be sure, the admission of nontestimonial physical evidence which is derived from a *Miranda* violation may marginally reduce the incentives to administer *Miranda's* prophylactic warnings. On the other hand, we believe "[t]he arguable benefits from excluding such [evidence] by way of possibly deterring police conduct that might compel admissions are . . . far outweighed by the advantages of having relevant and probative [evidence], not obtained by actual coercion, available at criminal trials to aid in the pursuit of truth." Whereas the goal of the fourth amendment's exclusionary rule is to deter unlawful police conduct, the goal of the fifth amendment's exclusionary rule is to assure trustworthy evidence. In the vast majority of cases, as in our case, there is plainly no reason to believe that nontestimonial physical evidence derived from uncounseled statements is untrustworthy.

*Id.* at 1517-1518 (citations omitted; ellipsis and brackets in original).[13]

---

[13] Harris argues that *Sangineto-Miranda* is distinguishable because it "involved [a] subject of a routine nature, that being the whereabouts of defendant's truck and a subsequent consent search of same . . .." The resulting derivative evidence, Harris maintains, was "easier to find because of *Sangineto-Miranda's* statements but . . . could have been determined or obtained by a more thorough investigation . . .." Harris argues that, by contrast, in his case the gun, keys, and bullets could only be located

The issue is a very difficult one, and "the state and federal courts have been divided on this question." *See Patterson v. United States*, 485 U.S. 922 & n.1, 108 S.Ct. 1093 & n.1, 99 L.Ed.2d 255 & n.1 (1988) (Justice White, with whom Justice Brennan joined, dissenting from the denial of certiorari). *See also* 1 WAYNE R. LAFAVE, SEARCH & SEIZURE § 3.2 at 119-120 (2d ed. Supp 1994) (discussing *Elstad*). After careful consideration of the powerful arguments on both sides, however, we agree with the federal courts' reasoning in *Cherry* and *Sangineto-Miranda*. In this case, therefore, the trial court properly admitted the challenged evidence.[14]

## III. JURY TAINT/INTEREST OF JUSTICE

Finally, Harris argues for a new trial in the interests of justice because a juror, who became the foreperson, was exposed to a newspaper article that

---

because of his confession and, without it, more thorough investigation still would not have discovered the evidence. Harris, however, merely speculates as to what further investigation might have located and, more significantly, offers no authority to suggest that the relative ease of discovering derivative evidence had anything to do with the court's conclusion in *Sangineto-Miranda*.

[14] The State argues that, even if the trial court erred in admitting this evidence, the error was harmless. We acknowledge the substantial basis for the State's argument and, given our focus on the legal issue in this case, we have provided only a short summary of some of the trial evidence. We need not reach the question of harmless error given our resolution of the suppression issue.

referred to Harris's suppressed confession.[15] The article appeared on the morning of trial and, during *voir dire*, the juror acknowledged that she had read the first part of the article. She stated, however, that she would be unaffected by its contents. Following an individual *voir dire* of the juror by both defense counsel and the court on this issue, counsel did not object to the juror and stated that he was "satisfied as far as the Sentinel article." Having pursued the issue during *voir dire* and having accepted the juror, Harris has waived this issue on appeal.

Therefore, finding no error in the trial court decisions, we affirm the conviction.

*By the Court.*—Judgment and order affirmed.

---

[15] The headline of the MILWAUKEE SENTINEL article read, "Trial in death of worker at TV station to begin." The subheadline read, "Judge's ruling limits use of confession." The first three paragraphs of the article read:

> Sixteen months after Dirk E. Harris was charged with murdering a television station floor manager, he is scheduled to stand trial Monday.
>
> But authorities might not be able to use the strongest piece of evidence they have against him—his confession.
>
> A detailed confession Harris allegedly gave to police a couple days after he was arrested in Texas was ruled inadmissible last week unless he testifies during his trial.